UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------- x

ELZBIETA GODLEWSKA, KRYSTYNA
BIELAWSKA, BARBARA HATALA and
BARBARA PILCH, on behalf of                          MEMORANDUM
themselves and all others                            AND ORDER
similarly situated,

                   Plaintiffs,                  Civil Action No.
                                          CV-03-3985 (DGT)
      - against -

HUMAN DEVELOPMENT ASSOCIATION,
INC., d/b/a HDA, YECHILA A.
GRUENWALD a/k/a YECHIEL GRUENWALD
individually and as Executive
Director of HDA, HUMAN DEVELOPMENT
ASSOCIATION, INC., ZVI KESTENBAUM,
MARINA VOSKOBOYNIKO, GOLDA POKHIS
a/k/a OLGA POKHIS, MARGARITA
ZILBERT, JANE DOE a/k/a "MRS.
GRIEDMAN," and JANE DOES 1-10 and
JOHN DOE 1-10, being fictitious
names, their true identities not
yet known to the Plaintiffs,

                   Defendants.
--------------------------------------------------- x

TRAGER, J.


      Plaintiffs Elzbieta Godlewska ("Godlewska"), Krystyna

Bielawska ("Bielawska"), Barbara Hatala ("Hatala") and Barbara

Pilch ("Pilch") (collectively, "plaintiffs") bring this action

against Human Development Association, Inc. ("HDA"), Yechila

Gruenwald ("Gruenwald"), Zvi Kestenbaum ("Kestenbaum"), Marina

Voskoboyniko ("Voskoboyniko"), Goda Pokhis ("Pokhis"), Margarita

Zilbert ("Zilbert") and multiple unnamed defendants for, _inter

alia_, violation of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).
Plaintiffs seek injunctive relief, compensatory damages,
unspecified punitive damages, and treble damages pursuant to the
RICO statute, as well as costs and attorneys' fees.

Plaintiffs are home attendants who are or were employed by
defendant HDA, an agency that employs home attendants in private
households.  Plaintiffs allege that defendants Voskoboyniko,
Pokhis, Zilbert and multiple unnamed defendants (one of whom is
known as "Mrs. Friedman" ("Friedman")) are "personnel
specialists" employed by HDA, who were tasked with assigning jobs
to plaintiffs and other home attendants employed by HDA.  The
gravamen of plaintiffs' complaint is that the personnel
specialists demanded kickbacks from plaintiffs and other home
attendants for assigning jobs and later continuing the job
assignments.  Defendants[1] move to dismiss plaintiffs' RICO claim
pursuant to Fed. R. Civ. P. 12(b)(6), contending that

(1) plaintiffs' pleading of an alleged RICO enterprise is legally
flawed; (2) defendant HDA cannot be held vicariously liable for
the acts of its employees; (3) plaintiffs have not adequately
pled the interstate commerce requirement of the statute and

---

[1] None of the Jane Doe or John Doe defendants have been
named or served in this action, but the motion for partial
dismissal has been lodged on behalf of HDA, Gruenwald, Kestenbaum
and "the corporate employees."  Insofar as the unnamed defendants
are all employees of HDA, the motion will be treated as having
been filed on behalf of all defendants.

(4) plaintiffs have failed to adequately plead a conspiracy to violate RICO.[2] For the following reasons, defendants' motion is granted and plaintiffs' RICO count is dismissed with leave to replead.

## Background

The following facts are drawn from the Amended Class Action Complaint (the "amended complaint")[3] and, for purposes of this motion, are presumed to be true. Each of the named plaintiffs began working for HDA between November 1989 and October 1996. Am. Compl. ¶¶ 25, 36, 45, 70. Immediately upon being hired, each

_____

[2] Defendants also argue at length that RICO claims have a stigmatizing effect on defendants and that frivolous RICO claims should be dismissed at the outset of a case. Def. Mem. at 4-6. While these assertions are no doubt true as a general matters, in the instant case plaintiffs have pled numerous predicate acts, and have alleged a non-frivolous RICO claim.

[3] On August 12, 2003, plaintiffs filed a Complaint in which they alleged that HDA was an "enterprise", as defined in 18 U.S.C. § 1961(4), and that defendants Gruenwald, Kestenbaum and the personnel specialists were "persons", as defined in 18 U.S.C. § 1961(3). Compl. ¶ 99. After defendants filed a letter request for a pre-motion conference stating that they wished to move to dismiss plaintiffs' RICO claim for failure to allege a RICO "enterprise" that was distinct from the RICO "persons", but before they filed a responsive pleading, plaintiffs filed their amended complaint on November 14, 2003. The only relevant difference between the original and amended complaints is that the amended complaint alleges that the "enterprise" is comprised not just of HDA, but also includes the Human Resources Administration of the City of New York ("HRA"), and the families of the wards who receive home attendant services. Am. Compl. ¶ 99.

of plaintiffs Godlewska, Bielawska and Pilch were informed by
other HDA employees, or, in the case of Pilch, by her aunt, that
they would be required to pay cash to their assigned personnel
specialists in order to receive job placements.  Id., ¶¶ 25, 36,
70.  Plaintiff Hatala was spared any demands for kickbacks until
several years into her employment.  Id., ¶ 45.  The allegations
pertaining to each named plaintiff are set forth in further
detail below.

**(1)**

Shortly after she was hired by HDA in October 1996, other
employees advised Godlewska that she would have to make a $1000
cash payment in order to obtain a job assignment.  Id., ¶ 25.
Defendant Voskoboyniko confirmed this advice when she met with
Godlewska and demanded a cash kickback.  Id., ¶ 26.  The next
month, Godlewska borrowed money from friends and paid the $1000
to Voskoboyniko, who placed Godlewska in a full-time job
assignment.  Id., ¶ 27.  The job only lasted for a couple months,
however, because Godlewska refused to pay more money to
Voskoboyniko, despite Voskoboyniko's numerous demands for
additional money.  Id., ¶ 28.

For the next two years, Godlewska was given only
intermittent job assignments, although she was able and willing
to work more, and in spite of the fact that there were many
assignments at HDA for which she was qualified.  Id., ¶¶ 29-31.

During this period, Voskoboyniko and other personnel specialists demanded kickbacks from Godlewska, which she refused to pay. Id., ¶ 30. In January 1999, Godlewska began petitioning defendant Pokhis for a full-time assignment, but Pokhis demurred, saying that Godlewska first needed to meet with her to discuss "certain issues." Id., ¶ 32. Godlewska understood Pokhis to be demanding a kickback in exchange for a job placement. Id.

In May 1999, Godlewska informed defendant Gruenwald, HDA's Executive Director, of the demands for payment by Voskoboyniko and Pokhis, and about the money she had in fact paid. Rather than confront Voskoboyniko and Pokhis, Gruenwald staged a "mock confrontation" of other personnel specialists. Id., ¶ 33. Godlewska has remained on the employment roll of HDA, but has not been assigned steady work because of her continued refusal to pay further kickbacks. Id., ¶ 34.

**(2)**

Plaintiff Bielawska was hired by HDA in November 1989, and was informed by other HDA employees that she would have to pay kickbacks to the personnel specialists in order to obtain and keep a job assignment. Id., ¶ 36. That month, Bielawska paid her supervisor $800, and was given a job assignment. Id., ¶ 37. Bielawska continued to make periodic payments of $200 over the next year and a half, and was placed in a series of

substitution and short-term jobs.  Id.  In early 1991, Bielawska approached Voskoboyniko about getting a job, to which Voskoboyniko responded that she would come to Bielawska's house to pick up a work authorization card.  Id., ¶ 38.  Bielawska understood from other HDA employees that this unusual request to visit her at her home to mean that Voskoboyniko would be expecting a cash payment.  Id.  Accordingly, Bielawska gave Voskoboyniko $200 in an envelope, after which she was given a full-time job assignment.  Id.

Bielawska was subsequently assigned to personnel specialist Pokhis, who, over the course of the next six years, periodically demanded money from Bielawska by asking that Bielawska "come to the office" and then demanding, "Did you bring the chocolate?" Id., ¶ 39.  Bielawska understood this question to be a veiled demand for a kickback, and during the period that Pokhis supervised Bielawska, Bielawska made approximately eleven payments to Pokhis, one of which was for $300 and the remaining ten of which were for $500.  Id., ¶¶ 39-40.

In October 2000, Bielawska was reassigned to personnel specialist Zilbert.  Id., ¶ 41.  Like Pokhis, Zilbert made repeated requests that Bielawska come to the office and "bring some chocolate," which Bielawska understood to be a demand for a kickback.  Id.  Bielawska made two payments of $300 to Zilbert. Id.  Bielawska's ward passed away in August 2001, and for the

next month, Bielawska called Zilbert frequently to ask for another job assignment.  <u>Id.</u>, ¶ 42.  Zilbert responded that no job assignments were available, but that Bielawska should meet her in person.  <u>Id.</u>  Bielawska finally complained to Zilbert on the telephone that she was being denied a job assignment due to her refusal to pay additional kickbacks, and Zilbert told her not to call again and then hung up on her.  <u>Id.</u>

Bielawska was never given another job assignment by Zilbert or HDA, and found herself blacklisted from other employment agencies after Zilbert and HDA apparently communicated to them that Bielawska was dangerous and a troublemaker.  <u>Id.</u>, ¶¶ 43-44.  Bielawska has consequently had difficulties finding work with other employment agencies.  <u>Id.</u>, ¶ 44.

**(3)**

Plaintiff Hatala was hired by HDA in October 1990, and enjoyed several years of steady employment caring for a single ward until January 1995.  <u>Id.</u>, ¶ 45.  In December 1994, Voskoboyniko offered Hatala another job assignment, but first demanded a kickback of $1200, which Hatala refused to pay until Pokhis urged her to pay the money to get the job.  <u>Id.</u>, ¶ 46.  At the end of December 1994, Hatala met with Voskoboyniko and paid her the $1200 in cash, after which she received the new job assignment.  <u>Id.</u>, ¶¶ 46-47.

Hatala was not given long to enjoy her new assignment – already in January 1995, Voskoboyniko was asking for more money, threatening that Hatala had "such a good job but could lose it at any time." Id., ¶ 48. Fearing the loss of her new job, Hatala paid Voskoboyniko $200 and Pokhis $300 in January 1995. Id., ¶ 49. Voskoboyniko told Hatala that she was the one who decided if Hatala would keep her job or not. Id. Later in 1995, as Hatala was preparing to leave for a vacation, Voskoboyniko demanded that she pay another kickback to ensure that she would still have a job when she returned. Id., ¶ 50. Hatala accordingly paid Voskoboyniko $500. Id.

In October 1995, Hatala's ward transferred to another employment agency, leaving her without work. Id., ¶ 51. Hatala was prepared to work, but because she could not pay any more kickbacks due to financial hardship, she was not given any further assignments, and was forced to apply for unemployment benefits. Id. Several months later, in April 1996, Hatala called Zilbert to ask for work, and Zilbert demanded a kickback. Hatala paid Zilbert $1000, after which Hatala was placed in another job assignment. Id., ¶ 52. The next eight months passed without incident, until Zilbert called Hatala at home in December 1996 and complained that she had not "received money lately." Id. at ¶ 53. Feeling that her job was at risk, Hatala paid Zilbert $500. Id., ¶ 54.

Later, Hatala was transferred to a different personnel specialist, defendant Friedman, whom Hatala contacted about a job assignment in April 1997.  _Id._, ¶ 55.  Although the amended complaint is silent about the next two years of Hatala's employment with HDA, it appears that she held a steady assignment during that time.  In March 1999, Hatala's ward passed away, but Friedman gave Hatala only substitutions and short-term assignments, rather than a full-time long-term assignment, due to Hatala's refusal to pay Friedman more kickbacks.  _Id._, ¶ 56.  In April 1999, Friedman called Hatala to HDA's office to discuss "important matters."  _Id._, ¶ 57.  Hatala believed that a cash payment was expected from her, and paid Friedman $500 with the understanding that, absent the payment, she would lose her job altogether.  _Id._  That same day, Friedman gave Hatala a job assignment caring for a new ward.  _Id._, ¶¶ 58-59.  The next month, though, Friedman threatened Hatala's new job by calling to tell her that her ward was complaining about Hatala, and that Friedman was thinking of reassigning her.  _Id._, ¶ 60. Understanding that her new job was at risk, Hatala paid Friedman $500 cash again.  _Id._  Although Friedman continued to demand kickbacks thereafter, Hatala refused to pay any more.  _Id._, ¶ 61.

Hatala's ward passed away in April 2000, and Hatala immediately began petitioning Friedman to give her another job

assignment.  <u>Id.</u>, ¶ 62.  Each time Hatala called, however,
Friedman told Hatala to come to the office to see to meet in
person.  <u>Id.</u>, ¶ 63.  Hatala, understanding the requests for a
meeting to be a demand for more kickbacks, declined, saying that
she only needed a job assignment, and an in-person meeting was
not necessary.  <u>Id.</u>, ¶¶ 63-64.  From the time of Hatala's ward's
death in April 2000 until July 2000, Hatala was given only two
short-term substitution jobs while the wards' regular attendants
were on temporary leave.  <u>Id.</u>, ¶ 65.  After Hatala once again
called her for a job assignment in July 2000, Friedman finally
responded, "Do not call me again, I will not have any jobs for
you."  <u>Id.</u>, ¶ 66.  Although Hatala has since been placed in a
steady job assignment through a different supervisor at HDA, she
complains that she has continued to suffer from defendants'
retaliatory measures by being placed in less desirable
assignments due to her refusal to pay more kickbacks.  <u>Id.</u>,
¶¶ 67-68.

### (4)

Plaintiff Pilch was hired by HDA in June 1993, and was
promptly informed by her aunt that she would have to pay a
kickback to her assigned personnel specialist, defendant Pokhis,
before she would be given any job assignments.  <u>Id.</u>, ¶ 70.  Not
having enough money to pay a kickback, Pilch offered Pokhis her
gold engagement ring, which Pokhis considered too small a bribe

to merit full-time work.  Id., ¶ 71.  Accordingly, Pokhis
assigned Pilch only to weekend jobs until March 1994, when Pilch
gave Pokhis $500 in cash.  Id., ¶¶ 71-72.  Pokhis still
considered this an insufficient bribe, and suggested that Pilch
be assigned to a new personnel specialist, Daphne.  Id. at ¶ 72.
Pilch did not give any money to Daphne, and as a result was not
given any job assignments.  Id.  Pilch applied for unemployment
benefits soon thereafter.  Id.

More than two years later, in August 1996, Pilch inquired
with defendant Voskoboyniko about a full-time assignment.  Id.,
¶ 73.  Voskoboyniko gave Pilch two part-time assignments, for
which she had to care for two patients in different locations for
four hours each per day.  Id.  This assignment was difficult for
Pilch to perform, and Voskoboyniko said that she would help Pilch
to get a full-time assignment in due time, but only if Pilch
"showed appreciation" for her efforts.  Id.  Later that month,
Voskoboyniko called Pilch and said, "I have a job for you, but
you have to come and see me."  Id., ¶ 74.  Pilch knew, from
conversations with other HDA employees, that she would be
expected to pay Voskoboyniko $1500 to get the job.  Id.  In
November, Pilch met with Voskoboyniko at HDA and gave her $1500
in cash.  Id., ¶ 75. Voskoboyniko then gave Pilch a full-time job
assignment.  Id.

Once Pilch had started the new assignment, Voskoboyniko

11

would call every two or three months to request more payments. Id., ¶ 76. Each time Voskoboyniko called, Pilch would take a sick day, withdraw cash from her bank account, and deliver the money to Voskoboyniko at HDA. Id. If Pilch was ever late with the money, Voskoboyniko would call the patient's home and speak with the patient with a view to eliciting negative comments about Pilch's work. Id., ¶ 77. Voskoboyniko would also retaliate by denying Pilch sick days. Id. From November 1996 to November 1998, Pilch paid Voskoboyniko periodic kickbacks of between $250 and $300. Id., ¶ 78. In November 1998, Pilch refused to pay any more kickbacks, and Voskoboyniko stopped giving her work altogether. Id., ¶ 79. In January 1999, Pilch applied for unemployment benefits. Id.

More than two years later, in June 2001, defendant Friedman called Pilch to see if she wanted to work for HDA again. Id., ¶ 80. Pilch agreed to return, but refused to pay Friedman any kickbacks. Id. In retaliation, Friedman only placed Pilch in jobs doing house cleaning work for HDA clients. Id. In September 2001, Pilch finally paid Friedman $1000, and she was immediately placed in a full-time home attendant position. Id., ¶ 81. However, only a month after starting the new job, Pilch refused a demand by Friedman for yet another payment, and she was taken off the job. Id. Unable to obtain another full-time assignment from Friedman, Pilch asked another supervisor, known

as "Sarah", for work.  <u>Id.</u>, ¶ 82.  Understanding that she would
not get a job from Sarah until she paid a kickback, Pilch gave
Sarah $500 in cash in June 2002, and was given a full-time
assignment two weeks later.  <u>Id.</u>, ¶ 83.


**Discussion**

A complaint may not be dismissed under Rule 12(b)(6) unless
"it appears beyond doubt that the plaintiff can prove no set of
facts in support of his claim which entitle him to relief."
<u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>see</u> <u>also</u>, <u>Commercial</u>
<u>Cleaning Serv., L.L.C. v. Colin Serv. Sys., Inc.</u>, 271 F.3d 374,
380 (2d Cir. 2001).  A court considering a 12(b)(6) motion must
accept the plaintiff's allegations as true and view them in the
light most favorable to the plaintiff.  <u>Scheuer v. Rhodes</u>, 416
U.S. 232, 236 (1974), <u>overruled on other grounds</u>, <u>Davis v.</u>
<u>Scherer</u>, 468 U.S. 183 (1984).  Courts may not consider matters
outside the pleadings but may consider documents attached to the
pleadings, documents referenced in the pleadings, or documents
that are integral to the pleadings.  <u>Chambers v. Time Warner,</u>
<u>Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002).

**(1)**

The RICO statute provides, in relevant part:

It shall be unlawful for any person employed by or
associated with any enterprise engaged in, or the

13

activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c). To state a claim for relief under section 1962(c), plaintiffs must allege that the defendants engaged in "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity (5) resulting in (6) injury to business or property." Zito v. Leasecomm Corp., No. 02-cv-8074, 2004 WL 2211650 (S.D.N.Y. 2004) (quoting Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 89 (2d Cir. 1999) (internal quotations omitted)). The statute defines "enterprise" as including "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity," and defines "person" as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. §§ 1961(3) and (4).

Courts have interpreted § 1962(c) as requiring plaintiffs to plead and prove "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). Thus, the Second Circuit has held that a claim that a corporation was the "person" and the corporation, together with all its employees and

14

agents, were the "enterprise" was properly dismissed for failure to meet the distinctness requirement. <u>Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.</u>, 30 F.3d 339, 344 (2d Cir. 1994). In that case, there was simply no difference between the "person" and the "enterprise".

In the amended complaint, plaintiffs have alleged the "enterprise" and "persons" as follows:

> 99. Defendant HDA is an agency that employs home attendants in private households and is under contract with the Human Resources Administration of the City of New York (HRA) for the provision of home attendant services to residents of the City of New York who are elderly and/or infirm, known as "wards" or "patients," and their families, with whom the defendant Personnel Specialists make arrangements. The foregoing constitute an enterprise as that term is defined in 18 U.S.C. § 1961(4), which engages in, and the activities of which affect, interstate commerce.

> 100. Defendants HDA, Gruenwald, Kestenbaum and Defendant Personnel Specialists are "persons" as that term is defined in 18 U.S.C. § 1961(3) and are employed by and associated with said enterprise.

There is some ambiguity in the wording of plaintiffs' alleged "enterprise": at first glance it is unclear whether HDA is alleged to be the enterprise and the discussion of HRA and the wards' families is intended to more particularly describe HDA, or HRA and the families are meant to be included as members of the enterprise. This ambiguity can be easily resolved in favor of the latter interpretation, however, given (a) that the form of

15

verb in the next sentence suggests that it was intended to modify a plural subject (i.e., "constitute" matches a plural interpretation of "the foregoing"), (b) a comparison to plaintiffs' original complaint, in which they alleged that HDA alone constituted the "enterprise", and (c) the unambiguous allegation in plaintiffs' Civil RICO Statement[4] that the enterprise consists of HDA, the personnel specialists, Kestenbaum, Gruenwald, HRA and the wards' families.

Defendants attack the sufficiency of plaintiffs' pleading of enterprise on the grounds that plaintiffs have failed to demonstrate that the alleged enterprise had any actual existence, organization or structure. In particular, defendants note the absence of any allegations explaining how the HRA or the wards' families were part of the enterprise. Earlier in the amended complaint, however, plaintiffs allege:

> 12. Upon information and belief, defendant HDA operates under contract with the Human Resources Administration of the City of New York for the provision of home attendant services to the residents of the City of New York, and more specifically of the borough of Brooklyn.

In addition, in their Civil RICO Statement, plaintiffs allege:

---

[4] Plaintiffs' Civil RICO Statement is considered part of the pleadings for purposes of Fed. R. Civ. P. 12(b)(6). See Manhattan Telecom. Corp. v. Dialamerica Mktg., Inc., 156 F. Supp. 2d 376, 379 n.3 (S.D.N.Y. 2001) (citing Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 396 (S.D.N.Y. 2000)).

6b. Defendant HDA is an agency that employs home attendants in private households, and is under contract with the Human Resources Administration of the City of New York (HRA) for the provision of home attendant services to the residents of the City of New York, and more specifically of the borough of Brooklyn. The plaintiffs are home attendants employed by the defendant agency who perform work for and provide care to "wards" or "patients" and their families in their private homes, usually with funding from the HRA. The families of the wards or patients generally make arrangements directly with HDA, and more specifically, the defendant "Personnel Specialists," for the work performed and the care provided by the plaintiffs.

In their opposition brief, plaintiffs explain in further detail the relationship between the alleged enterprise members, focusing on the flow of money from one entity to the next in the course of their normal business of providing home health care workers to elderly and infirm people with the help of Medicare/Medicaid funding. These alleged relationships, however, do not suffice to constitute an "enterprise" for purposes of RICO. While it may be true that HDA has connections to the larger world, it is also true that every entity engaged in modern commerce will find itself bound in a web of connections to other players in the market. In particular, the Second Circuit has required that an enterprise comprised of distinct entities "must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004) (citing First Nationwide Bank v. Gelt Funding

Corp., 820 F. Supp. 89, 98 (S.D.N.Y. 1993), aff'd, 27 F.3d 763
(2d Cir. 1994)) (internal quotations omitted); see also Advance
Relocation & Storage Co., Inc. v. Local 814, Int'l Brotherhood of
Teamsters, AFL-CIO, No. 03-cv-4475, 2005 WL 665119, at *8
(E.D.N.Y. 2005).

The complaint does not allege that HRA or the wards'
families have engaged in a fraudulent course of conduct.  Indeed,
it does not appear from the allegations in the complaint that HRA
and the wards' families were even aware of the extortionate
conduct of the personnel specialists.  They are, therefore, not
part of any properly-pled enterprise for purposes of
§ 1962(c).

On the other hand, the original complaint, which named
Gruenwald, Kestenbaum and the personnel specialists as "persons"
and HDA as the "enterprise", did make a proper allegation of an
enterprise for purposes of § 1962(c).  This formulation did not
suffer from the defect alleged by defendants in their pre-motion
conference letter: that the persons and enterprise were not
sufficiently distinct.  The Supreme Court has held that the sole
shareholder of a corporation may be the "person" and the
corporation may be the "enterprise" in a properly-pled RICO
complaint, because "[t]he corporate owner/employee, a natural
person, is distinct from the corporation itself, a legally
different entity with different rights and responsibilities due

18

to its different legal status." <u>Cedric Kushner Promotions</u>, 533
U.S. at 164. There is no allegation that the extortionate acts
allegedly committed by the personnel specialists were made on
behalf of HDA; therefore, the persons and the enterprise as
alleged in the original complaint were distinct. <u>Cf. Riverwoods</u>,
30 F.3d at 344 (distinctness requirement not met "by alleging a
RICO enterprise that consists merely of a corporate defendant
associated with its own employees or agents <u>carrying on the
regular affairs of the defendant</u>,. . . . [or] where employees of
a corporation associate together to commit a pattern of predicate
acts in the course of their employment <u>and on behalf of the
corporation</u>. . . .") (emphasis added, internal citations
omitted). Thus, although the RICO claim of the amended complaint
is deficient in its pleading of the "enterprise" element and must
be dismissed for that reason, plaintiff is given leave to replead
the "enterprise" element.

(2)

Defendants next argue that, even if the allegations of the
complaint are true, HDA cannot be held vicariously liable for the
acts of its low-level Personnel Specialist employees. Defendants
point out that there is no allegation in the complaint that HDA
benefitted from the extortion scheme, and that high-level
defendant employees Gruenwald and Kestenbaum are not alleged to
have played a central role in the scheme. Under these

circumstances, defendants contend that plaintiffs' naming of HDA as a defendant amounts to nothing more than a bald attempt to reach the deepest pocket available.

In determining whether a corporation may bear RICO liability for the actions of its employee "'the critical question is whether the illegal conduct alleged was known to and participated in by sufficiently high-level employees within a corporation and/or was sufficiently pervasive within the corporation as to be fairly attributed to the corporation.'" <u>Local 857 I.B.T. Pension Fund v. Pollack</u>, 992 F. Supp. 545, 568 (S.D.N.Y. 1998) (quoting <u>In re American Honda Motor Co., Inc. Dealerships</u>, 958 F. Supp. 1045, 1051 n. 3 (D.Md. 1997)). In addition, the corporation must have received a benefit from its employees' participation in the conspiracy. <u>Id.</u> at 569; <u>Burke v. Dowling</u>, 944 F. Supp. 1036, 1069-1070 (E.D.N.Y. 1995).

Plaintiffs have presented no evidence of any benefit to HDA from the extortionate practices of the personnel specialists, nor do they contend any. Instead, plaintiffs argue that "benefit to the corporation need not be shown when the basis of corporate liability is apparent authority." Pl. Mem. at 12. However, this theory, which was endorsed in <u>Amendolare v. Schenkers Int'l Forwarders, Inc.</u>, 747 F. Supp. 162 (E.D.N.Y. 1990), is specifically limited to those instances where the corporation is named as a RICO "person" but not as an "enterprise". <u>Id.</u> at 168.

Otherwise, the theory of liability would run afoul of the prohibition on naming a single entity as both the RICO person and enterprise.  See Moses v. Martin, 360 F. Supp. 2d 533, 549-51 (S.D.N.Y. 2004).  Because, as previously stated, HDA is not properly named as a RICO person, but would be properly named as a RICO enterprise, HDA cannot be held liable under the theory of apparent authority as the sole constituent of the enterprise.


**(3)**

Defendants further argue that plaintiffs have failed to adequately plead the "interstate commerce" element of RICO. Without a nexus to interstate commerce, there would be no federal jurisdiction over plaintiffs' RICO action.  See Tavakoli-Azar v. Crescent Mgmt., Inc., No. 97-cv-0696, 1998 WL 426733, at *4 (S.D.N.Y. July 28, 1998) ("The interstate commerce requirement is a critical consideration for a court as it is this element of the RICO statute that gives the federal courts jurisdiction over RICO actions.").  The amended complaint states:

> The defendants engage in an enterprise whose annual
> volume of sales made or business done is not less
> than $500,000.00, the activities of which affect
> interstate commerce in that the employees of said
> defendants handle, sell or otherwise work on goods or
> materials that have been moved in or produced for
> interstate commerce and the employees also free
> members of the household in which they are employed
> to themselves engage in activities in interstate
> commerce . . . .

Am. Compl. ¶ 11.

Defendants cite a Ninth Circuit case, <u>Musick v. Burke</u>, 913 F.2d 1390 (9th Cir. 1990), for the proposition that "merely drawing equipment and supplies from interstate commerce is 'qualitatively insufficient to establish Sherman Act jurisdiction.'" Def. Mem. at 16 (citing <u>Musick</u>, 913 F.2d at 1397). The Second Circuit, however, has adopted a less stringent standard than the Ninth Circuit for evaluating the impact a challenged activity must have on interstate commerce to be subject to federal jurisdiction. <u>See</u>, <u>e.g.</u>, <u>DeFalco v. Bernas</u>, 244 F.3d 286, 309 (2d Cir. 2001) ("The law in this Circuit does not require RICO plaintiffs to show more than a minimal effect on interstate commerce."); <u>United States v. Barton</u>, 647 F.2d 224, 233 (2d Cir.), <u>cert. denied</u>, 454 U.S. 857 (1981) ("In determining what connections with interstate commerce must be proven by the government to establish a violation of § 1962, the courts have ruled that the impact need not be great. So long as the activities of the enterprise affect interstate commerce, the jurisdictional element is satisfied."). Indeed, the <u>Barton</u> court found sufficient effects on interstate commerce to sustain a conviction under § 1962(c) where the defendants bombed a car and two buildings that were insured by out-of-state insurance carriers, where coffee and orange juice obtained from out-of-state sources was served in the buildings, and where the

defendants made some phone calls and trips to other states to order the explosives used in their racketeering activities. Barton, 647 F.2d at 232.

In this case plaintiffs allege that the home health care workers employed by HDA "handle, sell or otherwise work on goods or materials that have been moved in or produced for interstate commerce and the employees also free members of the household in which they are employed to themselves engage in activities in interstate commerce." Am. Compl. ¶ 11. This allegation neatly tracks the language adopted by the Department of Labor in explaining the basis for Congressional authority in extending the Fair Labor Standards Act to domestic workers. See 29 C.F.R. § 552.99. The fact that plaintiffs have employed boilerplate language in drafting this element of their complaint does not diminish its efficacy, as the interstate commerce requirement of a RICO claim need not be pled with particularity.[5] Indeed, "a motion to dismiss a RICO claim will not be granted unless 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Welch Foods, Inc. v. Moran, No. 93-cv-0729, 1996 WL 107130, at *3 (W.D.N.Y. Mar. 8, 1996) (quoting H.J. Inc. v. Northwestern Bell Telephone

---

[5]However, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[1][b] (3d ed. 1997).

<u>Co.</u>, 492 U.S. 229, 249-50 (1989)).

Plaintiffs further allege in their opposition brief, but not in the amended complaint, that HDA "receives federal Medicare and/or Medicaid money through the HRA for home care services." Pl. Mem. at 14. Indeed, this allegation also does not appear in the Civil RICO Statement, which, similarly to the amended complaint, alleges: "The employment of persons in domestic service in households affects interstate commerce. Employees in domsetic [sic] service employment handle goods such as soaps, mops, detergents, and vacuum cleaners that have moved in or were produced for interstate commerce and they also free members of the hsoushold [sic] to themselves to engage [sic] in activities in interstate commerce." Civil RICO Statement, ¶ 10. The Medicare/Medicaid connection unquestionably would have bolstered plaintiffs' claim that HDA is engaged in interstate commerce. <u>See</u>, <u>e.g.</u>, <u>United States v. American Soc. of Anesthesiologists, Inc.</u>, 473 F. Supp. 147, 156 (S.D.N.Y. 1979) ("That [the Medicare and Medicaid] programs operate in interstate commerce is beyond dispute."). However, because the allegation that HDA receives federal funds is nowhere found in the amended complaint or the Civil RICO Statement, it is not properly considered for purposes of the instant motion to dismiss.

In any event, the allegations contained in the amended complaint are sufficient to support the interstate commerce

requirement of the RICO statute.  Not only have plaintiffs
alleged a connection to interstate commerce by virtue of the
household products they used in their domestic employment, but
they have also alleged that at least some of the demands for
kickbacks were made over the telephone, which "is an
instrumentality of interstate commerce and . . . alone is a
sufficient basis for jurisdiction based on interstate commerce."
United States v. Gilbert, 181 F.3d 152, 158 (1st Cir. 1999)
(affirming federal conviction for making a bomb threat over the
telephone).  Accordingly, the interstate commerce requirement has
been met.

(4)

Subdivision (d) of 18 U.S.C. § 1962 prohibits "any person
[from] conspir[ing] to violate any of the provisions of
subsection (a), (b) or (c) of this section."  18 U.S.C.
§ 1962(d).  "[T]he requirements for RICO's conspiracy charges
under § 1962(d) are . . . :  A 'conspirator must intend to
further an endeavor which, if completed, would satisfy all of the
elements of a substantive criminal offense, but it suffices that
he adopt the goal of furthering or facilitating the criminal
endeavor.'  In the civil context, a plaintiff must allege that
the defendant 'knew about and agreed to facilitate the scheme.'"
Baisch v. Gallina, 346 F.3d 366, 376-77 (quoting Salinas v. U.S.,
522 U.S. 52 (1997)).

25

Defendants argue that they cannot be held liable for
conspiracy to violate RICO, because plaintiffs do not allege that
each of the defendants agreed to commit at least two predicate
acts. In fact, the amended complaint alleges numerous predicate
acts by each of the defendant personnel specialists, including
cooperation among the personnel specialists in passing off
plaintiffs from one personnel specialist to another. See, e.g.,
Am. Compl. ¶¶ 55-56. In addition, the complaint alleges that
defendant Gruenwald was informed of the personnel specialists'
extortion demands, but took no effective action to combat them,
essentially sanctioning them. As for defendant Kestenbaum,
plaintiffs allege that Kestenbaum had actual or constructive
knowledge of the scheme and acquiesced in it. Am. Compl. ¶¶ 22,
24. Thus, plaintiffs have sufficiently alleged that each of the
defendant personnel specialists and defendants Gruenwald and
Kestenbaum knew about and agreed to facilitate the extortion
scheme, and have properly alleged a RICO conspiracy.

**Conclusion**

For the foregoing reasons, the RICO claim of the amended complaint is dismissed for failure to properly plead the "enterprise" element of RICO, with leave to replead.  The interstate commerce element has been properly pled, as has RICO conspiracy.  However, if the "enterprise" element is pled in a newly-amended complaint such that HDA alone is the enterprise, then HDA may not be held liable under the theory of apparent authority.

Dated:     Brooklyn, New York
           July 18, 2005
                                   SO ORDERED:


                                   _____/s/_____
                                   David G. Trager
                                   United States District Judge