Docket No. 03 CV 3985 (RJD)(JMA)

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ELZBIETA GOLDEWSKA, KRYSTYNA BIELAWSKA,
BARBARA HATALA, and BARBARA PILCH, on behalf of
themselves and all others similarly situated,

                                                     Plaintiffs,

                   -against-

HDA, <u>et al.</u>,

                                              Defendants.

---

**CITY DEFENDANTS'  MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT ON THE ISSUE OF WHETHER CITY
DEFENDANTS ARE PLAINTIFFS' JOINT EMPLOYER**

---

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Andrea O'Connor*
*Tel:  (212) 676-2750*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

ARGUMENT ......................................................................................................................... 2

    **City Defendants Are Not Plaintiffs' Employer or Joint Employer and Therefore Cannot be Held Liable For Any Alleged Wage Violations Under the FLSA or § 1983. ................ 2**

    A.   Summary Judgment Standard ................................................................................. 2

    B.   Economic Reality Test ............................................................................................ 3

        1) Formal Control Test ............................................................................................ 3

        2) Functional Control Test ...................................................................................... 4

    C.   City Defendants Did Not Have Formal Control Over Plaintiffs ................................ 6

        1) Hiring and Firing ................................................................................................ 6

        2) Work Schedules and Conditions ........................................................................ 6

            (i) Work Schedules ............................................................................................ 7

            (ii) Conditions of Employment ......................................................................... 10

        3) Rate and Method of Payment ........................................................................... 13

        4) Records ............................................................................................................ 16

    D.   City Defendants Did Not Have Functional Control Over Plaintiffs ........................ 17

        1) Premises and Equipment .................................................................................. 17

        2) Whether HDA Shifts as a Unit ......................................................................... 17

        3) Whether Plaintiffs Performed a Discrete Line Job ........................................... 18

        4) Whether the Vendor Agencies Are Fungible .................................................... 19

        5) Supervision ...................................................................................................... 20

        6) Whether  Plaintiffs Worked Exclusively or Predominately for One Company ..... 20

        7) Other Relevant Factors .................................................................................... 21

**CONCLUSION** .................................................................................................................. **23**

**CITY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF WHETHER CITY DEFENDANTS ARE PLAINTIFFS' JOINT EMPLOYER[1]**

## PRELIMINARY STATEMENT

Plaintiffs, approximately 200 former and current home attendants employed by the Human Development Association, Inc. ("HDA") that filed timely consents to join in this action, filed this collective action pursuant to the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. ("FLSA") and 42 U.S.C. § 1983 against City of New York, New York City Human Resources Administration and the Honorable Verna Eggleston as Commissioner of the New York City Human Resources Administration (collectively "City defendants")[2] in which they alleged that they "performed work, labor and services but did not receive the compensation required by the FLSA."  Exhibit A, Third Amended Complaint, dated November 27, 2006.

City Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Rules of this Court.  Specifically, City Defendants move for summary judgment on the ground that City Defendants are not plaintiffs' employer or joint employer.  Accordingly, City Defendants cannot be held liable for any alleged wage violations under the FLSA or 42 U.S.C. §1983 and therefore respectfully requests that its motion for summary judgment be granted in its entirety.

---

[1] On September 19, 2011, the Court "so ordered" the parties' request that City Defendant and plaintiffs be permitted to file summary judgment motions solely on the issue of whether City Defendants are a joint employer of plaintiffs.

[2] This office does not represent defendants HDA, Human Development Association, Inc. d/b/a HDA, Yelchila Gruenwald, Zvi Kestenbaum, Marino Voskoboyniko, Golda Pokhis, Margarita Zilbert, Eva Friedman, Irena Gadzhiyeva, Sarah Juroviesky, Ella Rashkova, Bella Slomivc, and Rita Strashnov (collectively "HDA Defendants").

## STATEMENT OF FACTS

For their statement of facts, City Defendants respectfully refer the Court to City Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated January 9, 2012, ("56.1 Statement") and the exhibits and deposition transcripts upon which it is based.

## ARGUMENT

## CITY DEFENDANTS ARE NOT PLAINTIFFS' EMPLOYER OR JOINT EMPLOYER AND THEREFORE CANNOT BE HELD LIABLE FOR ANY ALLEGED WAGE VIOLATIONS UNDER THE FLSA OR § 1983.

**A.     Summary Judgment Standard**

Summary judgment may be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010).  Therefore, the non-moving party can only avoid summary judgment by establishing with "concrete particulars demonstrating that trial is necessary."  R.G. Group, Inc. v. Horn and Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984); See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Although the Court must view the facts in a light most favorable to the non-moving party, that party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  See Delaware & Hudson Ry. v. Consol. Rail Corp., 902 F.2d 174, 176 (2d Cir. 1990), cert. denied, 500 U.S. 928 (1991).  Thus, summary judgment cannot be defeated by drawing attenuated inferences, nor by relying "on mere speculation or

conjecture as to the true nature of the facts." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d. Cir. 1986), cert. denied, 480 U.S. 932 (1987).

Plaintiffs herein seek to hold City Defendants liable for alleged FLSA violations on the theory that City Defendants were "joint employers of plaintiffs." See Exhibit A, Third Amended Complaint, dated November 27, 2006.[3]  The Second Circuit has held that "the question whether a defendant is a plaintiff's joint employer is a mixed question of law and fact.  Such questions involve the application of a legal standard to a particular set of facts." Zheng v. Liberty Apparel Co., 617 F.3d 182, 185 (2d Cir. 2010).

**B.      Economic Reality Test**

"To be held liable under the FLSA, a person must be an employer." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (internal quotations omitted).  An entity functions as an individual's employer only if it "suffers or permits that individual to work." Zheng v. Liberty Apparel Co., 355 F.3d 61, 66 (2d Cir. 2003).  While the FLSA regulations recognize that an employee can be employed by "two or more employers at the same time," (see 29 C.F.R. §791.2),  "[t]he overarching concern is whether the alleged employer possessed the power to control the workers in question." Herman v. RSR Sec. Servs., 172 F.3d 132, 139 (2d Cir. 1999).

**1)  Formal Control Test**

"[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical legal concepts." Barfield v. New York City Health and Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008)(quoting Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961)).  This test is not to be employed blindly and should be considered in light of the "underlying policies of the

---

[3] All exhibits are annexed to the Declaration of Andrea O'Connor, dated January 9, 2012.

FLSA." See Danneskjold v. Hausrath, 82 F.3d 37, 42-43 (2d Cir. 1996) (explaining that a rigid application of the economic reality test would render all prison labor subject to minimum wage law despite the fact that "labor that serves institutional needs of the prison is not in economic reality an employment relationship"); see also Zheng, 355 F.3d at 76 (explaining that the economic realities test "is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA").  The "test is designed to constrain the otherwise broadly applicable plain language of the statute, which taken literally would support liability against any agent or employee with supervisory power over other employees." Diaz v. Consortium for Worker Educ., Inc., No. 10-CV-1848 (LAP), 2010 U.S. Dist. LEXIS 107722, at * 6 (S.D.N.Y Sept. 28, 2010) (internal quotations and alterations omitted).

The Second Circuit, in Carter v. Dutchess Community College, 735 F.2d 8 (2d Cir. 1984), identified four factors particularly relevant to the joint employment inquiry: whether the alleged employer: "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Carter, 735 F.2d at 12 (quoting Bonnette v. Calif. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)).  This test if often referred to by the courts as the "formal control test."

### 2) Functional Control Test

The Second Circuit later clarified that "[n]o one of the four factors . . . is dispositive . . . . [as] the economic realties test is determined based upon *all* the circumstances, [and] any relevant evidence may be examined." Herman, 172 F. 3d at 139.  Moreover, "different sets of relevant factors" may be relevant "based on the factual challenges posed by particular cases." Barfield, 537 F.3d at 142.

Subsequent to its decision in <u>Herman v. RSR Security Services, LTD</u>, the Second Circuit determined that the economic realities test should not be limited to the four factors of <u>Carter</u> when determining whether a joint employer relationship exists.  <u>Zheng</u>, 355 F.3d at 71. Therefore, the Second Circuit expanded the list of possible factors to determine whether a putative employer had "functional control" over alleged employees.  <u>See</u> <u>Barfield</u>, 537 F.3d at 143. The Court in <u>Zheng</u> devised a list of six factors that should be consider in determining whether a joint employment relationship exists:

> 1. Whether a putative joint employer's premises and equipment are used by its putative joint employees;
>
> 2. Whether the putative joint employees are part of a business organization that shifts as a unit from one putative joint employer to another;
>
> 3. Whether the putative employees perform functions integral to the putative joint employer's product or service;
>
> 4. Whether responsibility for the contracts can pass from one subcontractor to another without material changes;
>
> 5. The degree to which the putative joint employer supervises the putative employee's work; and
>
> 6. Whether the purported joint employees worked exclusively or predominantly for the putative joint employer.

Zheng, at 72-75.  The Second Circuit further held that the inquiry is a flexible one and considers whether an alleged employer may "dictate the terms and conditions of [an individual's] employment."  Zheng, 355 F.3d at 72.

**C.**   **City Defendants Do Not Have Formal Control Over Plaintiffs.**

**1)  Hiring and Firing**

The first factor relevant to formal control is "whether the alleged employer . . . had the power to hire and fire the employees." Carter, 735 F.2d at 12. The undisputed evidence demonstrates that City Defendants did not receive employment applications from plaintiffs, did not interview plaintiffs and did not inform plaintiffs that they were hired.. See 56.1 Statement at ¶¶ 56-58. Rather, it is undisputed that HDA makes all hiring decisions with respect to home attendants and HRA has no decision making authority with respect to which home attendants are hired. See Exhibit G at 362:22-25; 363:1-3; see also id. at 206:17-25 (personnel specialists employed by HDA hire the home attendants and "complete" the "hiring process"). Indeed, all named plaintiffs testified that they were interviewed and hired by a personnel specialist employed by HDA. See 56.1 Statement at ¶ 57.

Similarly, there is no evidence in the record that City Defendants played any role in the discipline and/or termination of a home attendant employed by HDA. In fact, defendant Gruenwald testified that HDA has never received a recommendation from HRA that a home attendant employed by HDA be disciplined or terminated. See Exhibit G at 364:16-18; 363:4-11.

As such, the first factor does not support a finding that City Defendants were plaintiffs' joint employer. See Spears v. Choctaw County Commission, 2009 U.S. Dist LEXIS 66037 at *23-25 (S.D. Al.) (finding that the entity that actually hires a given employee is the employer, even if a putative employer decides or effects how many employees should be hired).

**2)  Work Schedules and Conditions**

The second factor examines whether the putative joint employer "supervised and controlled employee work schedules or conditions of employment." Carter, 735 F.2d at 12.

### (i)  Work Schedules

The undisputed evidence demonstrates that plaintiffs receive job assignments as follows.  Pursuant to New York State law, HRA authorizes a patient to receive personal care services and authorizes the hours of service actually required by the patient and the tasks that a home attendant may perform when assigned to the patient.  See 18 NYCRR 505.14(b)(5).  Once services have been authorized, HRA must provide HDA with written information about the services authorized, including the tasks required and the frequency and duration of the services. See 18 NYCRR 505.14(b)(5)(vi).  However, it is New York State law that defines the exact tasks a home attendant can perform when personal care services are required, as well as the maximum number of hours a home attendant can work for a particular patient.  See 18 NYCRR 505.14(a)(6) et seq.

Defendant Rabbi Yechiel Gruenwald, Executive Director of HDA, testified that when a new service authorization is received by HDA, HDA's Deputy Director of Administration would assign the new patient to a personnel specialist employed by HDA based on the patient's address in that each personnel specialist had a designated geographic area under their purview. See Exhibit G at 22:6-23; 36:12-19; 96:15-21.  When possible, the Deputy Director would also try to assign a new patient to a personnel specialist who spoke the same language as the patient.  See id.. at 96:15-21.

A nurse employed by HDA then schedules a home visit to "see the makeup of the house, language, culture, what services they need, what type of home attendant would best serve [the patient]."  Id. at 232:20-25; 233:1-7.  The HDA nurse then relays this information to the assigned personnel specialist and the personnel specialist would try to "match up a home attendant to fit into the [] requirements of the client."  Id. at 232:20-25; 233:1-7.  The personnel specialist would then advise the home attendant of the patient's requirements with respect to hours and tasks

and if the home attendant was "willing to go along with the hours and whatever has to be done, the match is made."  Id. at 248:20-24.

In Jean-Louis, et al. v. Metropolitan Cable Communications, Inc., et al., 2011 US Dist. LEXIS 113084 (S.D.N.Y. Sept. 30, 2011), plaintiffs were employed by Metropolitan Cable Communications, Inc. ("Metro") as technicians and installed telecommunications services provided to New York City residents by Time Warner Cable of New York City ("Time Warner"). Plaintiffs alleged that Time Warner was their putative employer for the purposes of the FLSA. With respect to job assignments, Time Warner would receive a request for service from a customer and would then create a work order that identified the customer who made the request, the services required and the time window during which the services must be performed.  Jean-Louis, 2011 US Dist. LEXIS 113084 at *33.  Time Warner would then forward this request to Metro but did "not provide any instructions as to how Metro should assign technicians to perform the work orders."  Id.  The plaintiffs in Jean-Louis argued that by dictating the services to be provided and the hours during which the services must be performed, Time Warner was a joint employer.  Id. at *34.

The Court disagreed.  The Court held that "the fact that Time Warner tells Metro to perform certain jobs at certain times affects when technicians perform those jobs" but does not mean that Time Warner supervised and controlled plaintiffs work schedules.  Id.  In reaching this conclusion, the Court held that since it is Metro, and not Time Warner, that decides "which technician will work on which job and whether a technician will work on any jobs in that period at all," the fact that Time Warner dictates the services to be provided and the time at which they must be provided does not lead to the conclusion that Time Warner supervised and controlled plaintiffs' work schedules.  Id. at *34-35.  The Court also noted that one plaintiff testified that on some days, Metro did not assign him any jobs – even though Time Warner had forwarded work

orders to Metro on that day – and that this "testimony makes clear that Time Warner did not determine when Metro technicians worked." Id.  As such, the Court found that Time Warner did not supervise and control plaintiffs' work schedules.

The same analysis applies here.  Pursuant to statutory requirements, HRA forwards a service authorization to HDA that states the hours a home attendant may work for a patient and what services must be provided during those hours.  HDA then determines which home attendant will fulfill the service authorization.  As noted by this Court in another case involving cable technicians, the putative joint employer's assignments of specific hours during which work must be performed "stem[s] from the nature of the business and the need to provide reliable service and convenience to the consumer, not [from] the nature of the relationship between [the contractor] and [putative joint employer]." Lawrence v. Adderley Indus., 2011 U.S. Dist. LEXIS 14386 at *26 (E.D.N.Y. Feb. 11, 2011) (quoting Herman v. Mid-Atlantic Installation Services, Inc., 164 F.Supp.2d 667, 673 (D. Md. 2000)).  Similarly, here, the service authorization that HRA provides HDA is mandated by law in order to provide the patient with an adequate level of care and is in no way connected to the relationship between HRA and had, nor does it "dictate a conclusion that [HDA's home attendants] are [City Defendant's] employees." Id.

Indeed, plaintiff's only argument regarding any "control" City Defendants might have over plaintiffs' work schedules relates to the fact that HRA and HDA are parties to a contract that is essentially dictated??? by state law.  As noted above, pursuant to New York State law, after HRA has authorized a recipient to receive personal care services, it must also authorize the hours of service actually required by the recipient.  See 18 NYCRR 505.14(b)(5).  Then, HDA must provide the personal care services in accordance with the authorization.  See 18 NYCRR 505.14(b)(5)(vii).

By misconstruing these provisions of the law and the contract, plaintiffs allege that City Defendants "set limits on the hourly rates and total weekly wages paid for the services performed by [HDA's employees] . . . effectively control[ling] the hours worked by . . . plaintiffs . . ." See Exhibit A at ¶ 18.  Essentially, plaintiffs allege that HRA controls the amount of work plaintiffs perform based on the number of Medicaid clients HRA authorizes HDA to service. However, this argument is circular as, of course, a contractor can only employ people for the amount of work it has been contracted to perform - a contractor does not normally employ people for whom there is no work.

Moreover, as in Jean-Louis, the individually-named plaintiffs readily admit that they did not receive work assignments from HDA despite the fact that "full time work was readily available."  Exhibit A at ¶¶ 52 and 97.  In fact, all of the named plaintiffs allege that when they did not pay HDA's personnel assistants "kickbacks," they received no job assignments.  See generally Exhibit A.  As with Jean-Louis, this demonstrates that City Defendants did not determine whether plaintiffs were given job assignments.  Jean-Louis, 2011 US Dist. LEXIS 113084 at *34-35.

As such, there is no evidence that City Defendants controlled or supervised the hours that plaintiffs actually worked.

**(ii) Conditions of Employment**

In Zheng, the Court cautioned against "misinterpret[ing]" "run-of-the-mill subcontracting relationships" as a joint employer relationship.  Zheng, 355 F.3d at 74.  Therefore, "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement."  Id. at 75.  Moreover, the fact that the City, in its role as a regulator, ensures lawful compliance with public safety regulations, does not and should not

transform it into an employer.  See Moreau v. Air Fr., 343 F.3d 1179, 1189 (9th Cir. 2003) (noting

that it is "counterproductive to equate ensuring lawful compliance with 'control' or supervision of

employees") (cited to approvingly in Zheng, 355 F.3d at 75).

       Here, the undisputed evidence demonstrates that HDA was responsible for

monitoring the work performance of the home attendants it employed.  See Exhibit G at 85:9-13

(HDA conducts annual performance evaluation of its home attendants); Exhibit E at 67:13-16; see

also id. at 222:22-25; 223:1-6 ("the home care agency is responsible for monitoring the

performance of the home care workers.").  If there was an issue regarding the job performance of

one of the home attendants employed by HDA, such issues were handled by the HDA personnel

specialist assigned to that home attendant.  See Exhibit G at 83:25: 84:1-18.  Additionally, HDA

has never received a recommendation from HRA that a home attendant employed by HDA be

disciplined or terminated.  See Exhibit G at 363:4-11; 364:16-18.

       Furthermore, if a home attendant has a complaint or wanted to raise an issue

regarding the conditions of his or her employment, such complaints are directed, in the first

instance, to the home attendant's assigned personnel specialist.  Id. at 85:14-25; 86:1-2.  If the

home attendant does not want to bring a particular complaint to a personnel specialist, the home

attendant can bring it to either HDA's Deputy Director of Administration or to defendant

Gruenwald.  Id. at 85:14-25; 86:1-8.  Defendant Gruenwald testified that this complaint procedure

is detailed in HDA's employment manual.  Id. at 85:14-25; 86:1-14.  To be sure, HRA does not

accept complaints regarding "working conditions" from home attendants.  See Exhibit E at 49:1-

11; See Exhibit I 69:5-14 ("it wasn't [HRA's] role to take complaints by home attendants");

Exhibit F at 46:17-23 (CASA does not accept complaints from home attendants).

       Despite this undisputed evidence, plaintiffs may argue in response to this motion

that HRA's monitoring of the contract and of individual patients to ensure that services are being

provided in a timely and appropriate manner demonstrates that City Defendants exercise sufficient control over plaintiffs' work conditions such that they are a joint employer.  Again, this argument is incorrect.  Indeed, in <u>Jean-Louis</u>, the plaintiffs argued that Time Warner's "Quality Control inspectors . . . function as *de facto* supervisors of the Metro technicians" in that Time Warner: (1) conducts 800-900 quality control assessments per week and provides these assessments to Metro; (2) obtains real-time feedback regarding Metro installations from Time Warner customers; and (3) Metro utilizes the quality control assessments in disciplining technicians.  <u>Jean-Louis</u>, 2011 US Dist. LEXIS 113084 at *38-39.   However, the Court in <u>Jean-Louis</u> held that the above-listed facts were only evidence that Time Warner made efforts to ensure that Metro was providing quality service and not that Time Warner "controls the day-to-day manner in which technicians provide that service."  <u>Id.</u>

Similarly, the quality control assessments conducted by HRA, and which are mandated by New York State law, are focused on ensuring that the patients receive quality care.  This is evidenced by the undisputed fact that HRA does not entertain complaints from home attendants regarding their work conditions; rather, HRA only accepts complaints from patients.  Moreover, unlike <u>Jean-Louis</u> wherein the Court determined there was no joint employer relationship, HRA conducts no evaluations or assessments of a home attendant's job performance, nor is it involved in disciplining home attendants.

In <u>Lawrence</u>, this Court credited, and relied heavily on, the holding of the District Court of Maryland in <u>Jacobson v. Comcast Corp.</u>, 2010 U.S. Dist. LEXIS 102834 (D. Md. Sept. 28, 2010), which found that although the putative joint employer "maintains specific standards to which" the contractor and its employees must adhere and "regularly monitors the [employees] to ensure that their performance satisfies . . . expectations . . . [the putative joint employer] is not responsible for the day-to-day management of the [employees]."  <u>Lawrence</u>, 2011 U.S. Dist.

LEXIS 14386 at *29 quoting Jacobson, 2010 U.S. Dist. LEXIS 102834 at *5. Here, the same analysis applies. Pursuant to New York State law, HRA monitors the services provided by HDA so as to ensure that HDA is providing a satisfactory level of care to patients. This monitoring – which is far less than that in Jean-Louis – does not transform City Defendants into a joint employer. See Chen v. Street Beat Sportswear, Inc., 364 F. Supp. 2d 269 (E.D.N.Y. 2005) (supervision in the form of quality control is not synonymous with supervision that would lead to an inference of control over an employee's workplace conditions).

### 3) Rate and Method of Payment

The third factor asks whether the putative joint employer "determined the rate and method of payment." Carter, 735 F.2d at 12. New York State law requires that the contract between HRA and HDA include the rate at which the provider will be reimbursed for the provision of personal care services. See 18 NYCRR 505.14(c)(6). HDA is reimbursed for services based on hours of service performed for each Medicaid eligible recipient. See Exhibit C at Article 3. HDA is reimbursed for services by New York State (through the New York State Department of Health Medicaid Management Information System ("MMIS")) for the provision of home care services. See id. at 3.1(A)-(D); see also 18 NYCRR 505.14(h). The rate at which HDA is reimbursed for services provided must be approved by the New York State Department of Health. See Exhibit C at 3.1(A); see also 18 NYCRR 505.14(h); Exhibit I at 34:18-25; 35; 36:1-15 ("ultimate approval of provider rates [i.e. "the reimbursement rates"] . . . was the responsibility of the State Department of Health.").

With respect to the way in which HDA gets reimbursed for the care services provided, Defendant Gruenwald testified that information regarding the amount of hours each home attendant works during a given period of time is transmitted to SanData, a company HDA has a contract with to collect information regarding the hours worked by home attendants. Exhibit

G at 350:18-25; 351; 359:23-25.   Defendant Gruenwald testified that once a month the information regarding the amount of hours worked by the home attendants employed by HDA is transmitted by SanData to MMIS.  See Exhibit G 350:18-25; 351.  Previously, MMIS would then issue HDA a reimbursement check but currently MMIS directly deposits the reimbursement funds into HDA's bank account.  See Exhibit G. at 350:18-25; 351.

With respect to the salary paid to home attendants, New York State law, and therefore the contract in place between HRA and HDA, requires that home attendants be provided a wage package and benefits package "at a level comparable to that offered by not-for-profit home care agencies' collective bargaining agreements. . ." as well as Social Security coverage, unemployment insurance, workers' compensation, disability insurance, health benefits, and retirement benefits. See 18 NYCRR 505.14(h)(3)(ii)(b); see also Exhibit C at 6.3(B).   HRA has never mandated a specific wage or wage policy for its employees, except for compliance with New York City's "Living Wage Law."  See Exhibit I at 14:24-25; 15:1-22.  Rather, non-union vendor agencies, such as HDA, "always followed the union or tended to try to follow the union pattern of pay in terms of base wage and differential wages."  Id. 15:24-25; 16:1-14.  As such, the undisputed evidence demonstrates that HDA determines plaintiffs' rate of pay and HRA plays no role in determining this rate.

In Lawrence, this Court cited to Jacobson wherein plaintiffs argued that the putative employer had control over their wages because it paid the contractor on a per service basis and the contractor, in turn paid their technicians on a per service.  Lawrence, 2011 U.S. Dist. LEXIS 14386 at *30 citing Jacobson, 2010 U.S. Dist. LEXIS 102834 at *6.  However, this Court agreed with Jacobson's rejection of that claim.  Here, to hold that HRA controls HDA's wages because the State reimburses HDA based on the number of clients HRA has authorized HDA to service, would expand the FLSA to subsume almost all contractual relationships, which the Zheng

14

court specifically explained was not the intention of FLSA.  See id. at *30-31; see also Burnison v. Memorial Hosp., Inc., 1992 U.S. Dist. LEXIS 16987 (D. Kan. Oct. 7, 1992)(the fact that a municipality delegated its role of providing emergency medical services to a private subcontractor and appropriated money to reimburse the costs in providing those services does not mean that the municipality controls the wages of the subcontractor's employees).  Indeed, plaintiffs' argument that the City is a joint employer because it is administering a program which required by law would certainly run afoul of Zheng.

Similarly, in Jean-Louis, the Court held that the test for this factor "is whether a putative employer determines pay rates, not whether it affects them."  Jean-Louis, 2011 US Dist. LEXIS 113084 at *46 (emphasis added).  The undisputed evidence demonstrates that HDA determines the rate at which home attendants will be paid.  See 56.1 Statement at ¶¶ 48-51.  The fact that the rate for reimbursement is contained in the contract between HDA and HRA, as is required by law, in no way "determines" the pay rates for home attendants.  See Jean-Louis, 2011 US Dist. LEXIS 113084 at *45 ("what Time Warner paid Metro for a given job no more determines what Metro pays technicians per hour than customers who buy a given product determine how the companies who produce the product pay the employees who actually make it.").

Moreover, HRA is even one more step removed from determining pay rates than in Jean-Louis because City Defendants, as of 2008, contributed no funds to reimbursing HDA for services provided, and prior to that, only contributed 10% of the total funds provided to HDA through MMIS.  See Exhibit H at 3.3 ("City's mandated percentage . . . not to exceed . . . zero dollars"); Exhibit I at 42:24-43:10, 46:4-11.  However, in Jean-Louis, Time Warner paid for 100% of the services provided by Metro under their contract and the Court still found that "the third

Carter factor weight against finding that Time Warner jointly employs Metro technicians." Jean-Louis, 2011 US Dist. LEXIS 113084 at *45.

Finally, to the extent that the setting of home care agency reimbursement rates had an indirect effect on the home attendants' wages, it is the State not the City that has the final authority to set these rates. See 18 NYCRR 505.14(h). Accordingly, as a matter of proximate causation, the City cannot be held liable for actions it is not legally entitled to take. See DOT v. Public Citizen, 541 U.S. 752, 770 (U.S. 2004) ("[W]here an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect.").

As such, it cannot be said that City Defendants actually determine the rate of pay for plaintiffs.

### 4) Records

The fourth factor asks whether the putative joint employer "maintained employment records." Carter, 735, F.2d at 12. Because City Defendants are not involved in any aspect of plaintiffs' hiring, firing, timekeeping, discipline or compensation, it does not maintain any personnel files regarding plaintiffs. See Exhibit G at 79:13-25; 80:1-14; Exhibit E at 223:5-14 (home attendant's personnel file is "in [the] possession of the home care agency."); See Exhibit C at 6.3(A); Exhibit G at 350:18-25; 351; 359:23-25.

In addition, the fact that HRA maintains records with respect to monitoring HDA's quality control and fiscal soundness in no way suggests that City Defendants is a joint employer. See Jean-Louis 2011 US Dist. LEXIS 113084 at *46-47 (maintaining records for quality control purposes is not synonymous with employee records); see also Lawrence 2011 U.S. Dist. LEXIS 14386 at *30.

Accordingly, as City defendants clearly do not exert formal control over plaintiffs, they are not plaintiffs' joint employer.

**D.      City Defendants Did Not Have Functional Control Over Plaintiffs**

Turning to the factors identified by the Second Circuit in the <u>Zheng case</u>, it is similarly clear that City Defendants do not exert "functional control" over plaintiffs and are therefore not plaintiffs' joint employer.

### 1)  Premises and Equipment

The first prong of the test asks simply whether or not the putative employees use the putative employer's premises and equipment.  There is no question that home attendants work in the homes of the elderly and infirmed to whom they are assigned by HDA, not on the City's premises or with City equipment.   <u>See</u> 18 NYCRR 505.14(a)(1).

### 2)  Whether HDA Shifts as a Unit

The second prong examines whether the putative joint employees are part of a business organization that shifts as a unit from one putative joint employer to another.  In <u>Zheng,</u> the Second Circuit held that this factor "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client."   <u>Zheng</u>, 355 F.3d at 72.  However, as "the Second Circuit had cautioned . . . the absence of a broad client base  . . . is not anything close to a perfect proxy for joint employment (because they are both perfectly consistent with a legitimate subcontracting relationship)."  <u>Jean-Louis</u>, 2011 U.S. Dist LEXIS at *53-54.  Thus, the factor is only relevant to the extent that it demonstrates, "functional control by those contractors over the subcontractors employees."  <u>See</u> <u>Zheng</u>, 355 F.3d at 75 n.12.  In interpreting the Supreme Court's decision in <u>Rutherford Food Corp. v. McComb</u>, 331 U.S. 722, (1947), the Second Circuit in <u>Zheng</u> further noted that, in <u>Rutherford</u>, the putative joint employer regularly switched

subcontractors and that, despite this high turn-over rate for subcontractors, the "contracts passed from one" subcontractor "to another" without any "material" disruption. <u>Zheng</u>, 355 F.3d at 70.

Here, there is no evidence in the record that plaintiffs worked exclusively for patients whose service was authorized by HRA.  In fact, at least one of the named plaintiffs alleged to have sought work at other home care agencies.  <u>See</u> Exhibit A at ¶ 62.  Additionally, another plaintiff alleged that when her patient was transferred to another home care agency, she remained employed at HDA.  <u>Id.</u> at ¶ 69.  Thus, plaintiffs cannot establish that they worked as a unit exclusively for the City defendants.  Furthermore, because HDA determines each home attendant's individual assignments, it certainly cannot be said that the contract between HDA and HRA could be "passed" to another home care agency without "material" disruption.

Finally, there is no evidence in the record that City Defendants in any way preclude HDA from contracting with any other public or private entities to provide home care services and therefore the second <u>Zheng</u> factor does not weigh in favor of finding that City Defendants was a joint employer.  <u>See</u> <u>Jean-Louis</u> 2011 US Dist. LEXIS 113084 at fn. 10 ("[W]here Time Warner does nothing to prevent Metro from contracting to assign technicians to other cable companies, the fact that the Plaintiffs do not work for other companies is not the result of Time Warner's actions towards them.").

### 3)  Whether Plaintiffs Performed a Discrete Line Job

The third prong of the <u>Zheng</u> test asks whether the putative employees perform functions integral to the putative joint employer's product or service.  In other words, "is this job typically outsourced?"  Courts will look at industry custom in evaluating this point, and will distinguish between work that is typically performed by an employee from work that can be outsourced.  <u>Zheng</u>, 355 F.3d at 73.  It is undeniable that Medicaid home attendant services in New York are typically outsourced by the local social services agency that administers the

Medicaid program in the locality as evidenced by the detailed regulations in place to govern such outsourcing.

Indeed, as fully outlined in the 56.1 Statement, the State has promulgated detailed regulations governing the outsourcing of home care services.  See generally 56.1 Statement.  New York State law mandates that the State approve the contract between the local services agency and the vendor. State law further requires that the local service agency have a plan for monitoring and auditing the delivery of services, and it also imposes additional requirements when the home attendant agency provides care exclusively to Medicaid recipients. 18 NYCRR 505.14(c).  The State also regulates the documentation that must be submitted by home attendant agencies to receive reimbursement, mandates the rate of reimbursement, as well as the salaries to be paid to home attendants providing services to Medicaid recipients under vendor contracts.  18 NYCRR 505.14(h).  Thus, in New York, Medicaid home care services are typically outsourced by local social services districts administering the Medicaid program and is therefore "unlikely to be a mere subterfuge to avoid complying with labor laws." Zheng, 355 F.3d at 73.

### 4)  Whether the Vendor Agencies Are Fungible

The fourth prong of the Zheng test concerns whether responsibility for the contracts can pass from one subcontractor to another without material changes.  This factor "asks not whether all of the putative joint employer's contractors do the same work but whether, if the putative join employer hired one contractor rather than another, 'the same employees would continue to do the same work in the same place.'" Jean-Louis 2011 US Dist. LEXIS 113084 at *61 (quoting Zheng 355 F.3d at 74 fn. 11)(emphasis in original).

Here, there is no evidence that the home attendants employed by HDA would continue to work for the same patients as they are currently assigned if HRA severed its relationship with HDA.  Indeed, plaintiffs perform home care services only because HDA has

contracted with HRA.  As was the case in <u>Jean-Louis</u>, the evidence in the record demonstrates that HRA contracts with HDA who then hires the home attendants.  In fact, the evidence suggests that if HDA dissolved, home attendants seeking to continue to work for City Medicaid patients would be required to apply and be hired for a position with another home care agency.  <u>See</u> Exhibit G, Gruenwald 6/7/10 Dep. at 365:16-25; 366:1.  This is further evidenced by defendant Gruenwald's testimony if a home attendant's assigned patient was transferred to another home care agency, and if the home attendant wanted to continue working with that patient, the home attendant would have to be hired by the new agency in order to continue working for that patient.  <u>See</u> Exhibit G at 365:16-25; 366:1.

**5) Supervision**

The fifth consideration is the degree to which the putative joint employer supervises the plaintiffs' work.  As set forth above with respect to the second <u>Carter</u> factor, to the extent HRA supervised HDA's home attendants, it did so to ensure compliance with the applicable law and to make sure that quality services were being delivered in a timely manner.  <u>See</u> section C(2)(ii); <u>Zheng</u> 355 F.3d at 75.  Therefore, the City's monitoring of the quality of care and the actual hours of service provided, as required by state regulations, are insufficient to establish the extensive supervision required to satisfy this prong.

**6) Whether    Plaintiffs Worked Exclusively or Predominately for One Company**

The sixth <u>Zheng</u> factor asks "whether plaintiffs worked exclusively or predominantly" for the putative employer.  <u>Zheng</u>, 355 F.3d at 72.  Here, all the named plaintiffs allege that, on at least one occasion, they did not receive assignments from HDA.  <u>See generally</u> Exhibit A.  Additionally, one plaintiff worked for the U.S. Census Bureau, two plaintiffs received unemployment benefits, and, at least one plaintiff sought work with another home care agency.

Id.  These allegations strongly suggest that plaintiffs did not perform services exclusively pursuant to the contract in place between HRA and HDA.

### 7)  Other Relevant Factors

A district court is also "free to consider any other factors it deems relevant to its assessments of the economic realities." Zheng, 355 F.3d at 72.

One of the factors that must be considered here is the degree to which New York State law governs the contractual relationship between HRA and HDA.  As fully outlined in the 56.1 Statement, nearly every clause of the contract in place between HRA and HDA is mandated by state law.  Indeed, the contract itself must be approved by the New York State Department of Health.  Moreover, New York State law dictates the exact tasks a home attendant can perform when providing personal care services as well as the maximum number of hours a home attendant can work for a particular patient.  18 NYCRR 505.14(a)(6) et seq.  Therefore, when authorizing services for a new patient, HRA must authorize tasks and hours within the parameters of the law.

To the extent that the City authorizes, however, it does so a regulator not an employer and because it is required to do so by State law.  Thus, the City's limited "supervision" does not demonstrate that it is an employer as a matter of economic reality any more than the Health Department would be an employer of restaurant line cooks by virtue of the fact that its inspects their activities in the kitchen.  See Moreau, 343 F.3d at 1188-1189 ("[M]uch of the indirect supervision or control exercised by Air France over the ground handling employees was purportedly to ensure compliance with various safety and security regulations . . . .  Any airline that is concerned about its passengers' safety would be remiss to simply delegate a task to another party and not double-check to verify that the task was done properly. . . . [I]t could be counterproductive to equate ensuring lawful compliance with 'control or supervision of employees.'"); Zhao v. Bebe Stores, Inc., 247 F. Supp. 2d 1154, 1160 (C.D. Cal. 2003) (holding

that monitoring to ensure "compliance with labor laws, cannot and should not be equated with . . . control, either direct or indirect, over Plaintiffs' payroll records, wages, or working conditions") ; Matson v. 7455, Inc., 2000 U.S. Dist. LEXIS 23013, at * 12 (D. Or. Jan. 14, 2000) (holding that a putative employer's supervision relating to the a "six inch rule" for exotic dancers was "not reflective of the defendants' control over [the plaintiff's] job performance . . . [because] it was implemented by the defendants to avoid potential criminal liability").

Accordingly, because the record establishes that City defendants do not have "formal" or "functional" control over plaintiffs, the Court should find that City defendants are not a joint employer as a matter of law.

**CONCLUSION**

For the foregoing reasons, City Defendants respectfully request that the Court issue an order granting their motion for summary judgment on the joint employer issue and dismissing plaintiffs' claims against City Defendants in their entirety, with prejudice, and awarding defendant such other and further relief as the Court deems just and proper.

Dated:          New York, New York
                January 9, 2012


                              MICHAEL A. CARDOZO
                              Corporation Counsel of the
                                 City of New York
                              Attorney for City Defendants
                              100 Church Street, Rm. 2-146
                              New York, New York 10007
                              (212) 676-2750
                              aoconnor@law.nyc.gov

                              By:    _____/s/_____
                                     Andrea O'Connor
                                     Assistant Corporation Counsel


Diana Goell Voigt,
  Andrea O'Connor,
  Benjamin Welikson (on the brief)
   Of Counsel.

23