UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————————————————X

ELZBIETA GODLEWSKA, KRYSTYNA BIELAWSKA,
BARBARA HATALA, BARBARA PILCH, and
BOLESLAW PRYZGODA, on behalf of themselves and
all others similarly situated,

                              Plaintiffs,          **MEMORANDUM AND**
                                                   **ORDER**
        –against–                                  CV–03–3985 (RJD) (JMA)

HDA, HUMAN DEVELOPMENT ASSOCIATION, INC.,
d/b/a HDA, YECHILA GRUENWALD a/k/a YECHIEL
GRUENWALD individually and as Executive Director of
HDA, HUMAN DEVELOPMENT ASSOCIATION, INC.,
ZVI KESTENBAUM, MARINA VOSKOBOYNIKO,
GOLDA POKHIS a/k/a OLGA POKHIS, MARGARITA
ZILBERT, EVA FRIEDMAN, IRENA GADZHIYEVA,
SARAH JUROVIESKY, ELLA RASHKOVA, BELLA
SLOMIVC, RITA STRASHNOV, THE CITY OF NEW
YORK, NEW YORK CITY HUMAN RESOURCES
ADMINISTRATION and VERNA EGGLESTON, as
Commissioner of NYC Human Resources Administration,

                              Defendants.

————————————————————————————————————X


APPEARANCES:


        Robert Wisniewski
        Robert Wisniewski & Associates, P.C.
        225 Broadway, Suite 612
        New York, New York 10007
        *Attorney for Plaintiffs*

        Michael A. Cardozo, Corporation Counsel of the City of New York
        Andrea O'Connor, Assistant Corporation Counsel of the City of New York
        New York City Law Department
        Office of the Corporation Counsel
        100 Church Street, Rm. 6-119
        New York, New York 10007
        *Attorneys for City Defendants*

1

**AZRACK, United States Magistrate Judge**:

In June 2012, the parties consented to my deciding summary judgment motions concerning whether defendants the City of New York (the "City"), New York City Human Resources Administration ("HRA"), and Verna Eggleston as HRA Commissioner (together, "City Defendants") are plaintiffs' joint employer. ECF Nos. 276, 281. Now before me are the (i) City Defendants' motion for summary judgment, in which City Defendants argue that they are not plaintiffs' joint employer; and (ii) plaintiffs' cross-motion for summary judgment, in which plaintiffs argue the contrary position. ECF Nos. 270–75, 277–80. For the reasons discussed in this memorandum, City Defendants' motion for summary judgment is granted, and plaintiffs' cross-motion for summary judgment is denied.

## BACKGROUND

Plaintiffs seek (i) unpaid prevailing, minimum and overtime wages, benefits, liquidated damages, reasonable attorneys' fees, and damages for retaliation under the Fair Labor Standards Act of 1938 (29 U.S.C. § 201, *et seq.*) ("FLSA"), the Civil Rights Act of 1871 (42 U.S.C. § 1983), 42 U.S.C. § 1988, N.Y. Labor Law Arts. 6 and 19, and New York State common law; (ii) actual, treble, and punitive damages for violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964) and N.Y. Labor Law §§ 193 and 198–b; and (iii) under New York State common law for unjust enrichment and negligent hiring and supervision. Third Am. Compl., ECF No. 95. Plaintiffs are former or current home attendants employed by defendant Human Development Association ("HDA"), a not-for-profit agency that contracted with HRA to provide home attendant services to City residents.[1] See Home Attendant Services

---

[1] HDA is not a party to the instant summary judgment motions.

2

Agreement, dated November 2, 2001 ("Contract") at 1, Ex. C.[2]  Plaintiffs allege, among other things, that City Defendants (1) are subject to the FLSA's compensation requirements because they are plaintiffs' joint employer; and (2) violated the FLSA by not paying plaintiffs as that statute requires.

Motion practice in this case has spanned several years.  In April 2004, defendants brought a motion to dismiss plaintiffs' civil RICO claim, which Judge David Trager granted in part and denied in part.  See Godlewska v. Human Dev. Ass'n, No. 03–CV–3985, 2005 WL 1667852 (E.D.N.Y. July 18, 2005), ECF No. 49.  On May 18, 2006, I granted in part and denied in part plaintiffs' motion to amend their First Amended Complaint.  See Godlewska v. Human Dev. Ass'n, No. 03–CV–3985, 2006 WL 1422410 (E.D.N.Y. May 18, 2006), ECF No. 72.  Plaintiffs amended their complaint twice thereafter.  See ECF Nos. 74, 95.  On September 19, 2011, I granted plaintiffs' and City Defendants' request for permission to file summary judgment motions solely on the issue of whether City Defendants are a joint employer of plaintiffs.  In June 2012, plaintiffs and City Defendants consented to my deciding the summary judgment motions.  ECF Nos. 276, 281.

A.  **New York State's Medicaid Program**

Medicaid law entitles qualified patients to receive "personal care services" ("PCS").  42 U.S.C. § 1396d(a)(24); N.Y. Soc. Servs. L. § 365–a(2)(e).  The federal government and participating states finance Medicaid jointly.  42 C.F.R. § 430.0.  New York, as a participating state, established a "plan" for providing Medicaid services, which the federal government approved.  See 42 U.S.C. §§ 1396–1, 1396b(a); 42 C.F.R. § 430.0.

---

[2] Lettered exhibits referred to herein are annexed to the Declaration of Andrea O'Connor, Esq., dated January 9, 2012, ECF No. 271.  Numbered exhibits referred to herein are annexed to the Declaration of Robert Wisniewski, Esq., dated April 3, 2012, ECF No. 277-1.  Unless otherwise indicated, "Contract" refers to Part I of the Contract.

The New York State Department of Health ("NYSDOH") is the state agency that implements and supervises New York's Medicaid plan and oversees the governing state regulatory scheme.  See N.Y. Pub. Health L. § 201(1)(v); N.Y. Soc. Servs. L. § 363–a(1); 18 N.Y.C.R.R. § 505.14 (the "Regulations").  Pursuant to the Regulations, NYSDOH delegates running the PCS program to "local social services districts," such as the City.  See 18 N.Y.C.R.R. § 505.14; N.Y. Soc. Servs. L. §§ 56, 62.  HRA administers the City's PCS program and contracts with home healthcare agencies such as HDA to provide PCS to eligible patients. See Ng Dep. 69:2–3, 4/9/10.  HDA is a not-for-profit agency organized "for the sole purpose of providing personal care services under contract with the City" to persons the City determines are Medicaid-eligible for such services.  Contract at 1.  Plaintiffs are former and current home attendants that HDA employed.

**B.      HRA and HDA**

**1.      The Contract**

The Regulations require HRA to use a State-approved model contract when it contracts with home healthcare agencies.  18 N.Y.C.R.R. § 505.14(c).  The City may vary the model contract only if the variations do not change the model contract's requirements and NYSDOH permits the variation.  Id.  HDA and HRA did not negotiate over the Contract.  Ng Dep. 109:20– 110:4, 4/9/10; Gruenwald Dep. 354:4–12, 6/7/10.  HRA reserves the right to terminate the Contract without cause if doing so would be in the City's best interest.  Contract Part II Art. 6.1(F).

The Contract states several times that City Defendants do not have an employment relationship with HDA or the home attendants.  See Contract Art. 10.1(B), Contract Part II Arts. 5.1, 5.4.

## 2.      How City Defendants Authorize PCS

The Regulations govern in detail the terms, delivery, and administration of PCS, which they define as "some or total assistance with personal hygiene, dressing and feeding; and nutritional and environmental support functions," which "must be essential to the maintenance of the patient's health and safety in his or her own home, as determined by the social services district in accordance with the Regulations of the Department of Health; ordered by the attending physician; based on an assessment of the patient's needs and of the appropriateness and cost-effectiveness of services . . .; and supervised by a registered professional nurse."  18 N.Y.C.R.R. § 505.14(a) *et seq*.  The Regulations list specific PCS tasks that City Defendants may authorize and, for some of those tasks, the maximum number of hours a home attendant may work for a particular patient.  See id.

The Regulations also dictate the procedures HRA must follow when a prospective Medicaid patient requests services.  First, the patient's physician must submit an order on the form the State requires.  Id. §§ 505.14(b)(2)–(3)(i).  Second, an HRA employee must complete a social assessment of the prospective patient on a form the State requires.  Id. §§ 505.14(b)(2)–(3)(ii).  Third, a nurse must assess the patient.  Id. §§ 505.14(b)(2)–(3)(iii).

Using input from the doctor, nurse, and social assessment, HRA's Community Alternative Systems Agency division ("CASA") makes the initial determination whether to authorize any of the specific tasks the Regulations enumerate and, if so, how many hours to authorize.  See id. § 505.14(b)(5); Kalvin Dep. 7:16–8:5, 11/8/10.  Once the City authorizes services, HRA provides HDA with written information about the services authorized, including their duration and frequency.  See 18 N.Y.C.R.R. § 505.14(b)(5).  HRA must approve any change to the authorization.  Id. § 505.14(b)(5)(vii).

### 3.    Hiring and Training Home Attendants

Pursuant to the Contract, HDA is "responsible for the recruitment and employment" of home attendants.  Contract Art. 6.1.  HDA screens all prospective home attendants and chooses which ones to hire.  Id. Art. 6.1(C)–(D); Gruenwald Dep. 362:22–363:3, 6/7/10.   HDA "personnel specialists" conduct the interviewing and hiring.  See Godlewska Dep. 20:19–21, 1/22/09; Bielawska Dep. 14:5–21, 1/23/09; Pryzgoda Dep. 11:3–13, 2/1/10; Pilch Dep. 13:12–18, 2/9/10.

The Regulations dictate specific minimum qualifications for home attendants who provide PCS, including "maturity, emotional and mental stability," experience in personal care or homemaking, literacy, "sympathetic attitude," certification of good physical health, a criminal history record check, and certain required training that NYSDOH approves – forty hours of "basic training," three semi-annual hours of "in-service" training, and on-the-job training as needed.  18 N.Y.C.R.R. § 505.14(d)(4)–(e).

In addition to the regulatory requirements, the Contract requires HDA to hire at least one Public Assistance recipient for each $250,000 in the Contract's value, though HDA may request that HRA exempt it from this requirement on grounds of "extreme hardship."  Contract Part II Art. 7.

### 4.    The Assignment Process at HDA

When HDA receives a service authorization for a new patient, an HDA nurse schedules a home visit to see what type of home attendant would best serve the patient.  Gruenwald Dep. 232:20–233:7, 5/4/10.  HDA also assigns the new patient to a personnel specialist, who gives the home attendant her assignments and is responsible to find a suitable substitute if the home attendant is sick.  See 18 N.Y.C.R.R. § 505.14(f)(2); Gruenwald Dep. 36:12–19, 96:15–21,

5/3/10; Gruenwald Dep. 206:17–22, 5/4/10; Hatala Dep. 264:5–10, 1/21/10; Biewlawska Dep. 10:22–24, 1/23/09; Pryzgoda Dep. 71:19–25, 2/1/10; Pilch Dep. 26:13–15, 2/9/10; Contract Art. 6.2(F).

### 5. Supervision and Monitoring

i. *Supervision of Home Attendants*

The Regulations require that home attendants receive "administrative supervision" and "nursing supervision," both of which HDA handles. 18 N.Y.C.R.R. § 505.14(f). The administrative supervision includes "verifying" that the patient is receiving PCS according to the City's authorization, evaluating home attendants' job performance or helping the nurse supervisors to do so, checking home attendants' time cards, and keeping scheduling records. Id. § 505.14(f)(2); see Contract Arts. 6.2, 6.5(B). The nursing supervision entails instructing or training the home attendant upon initiating services for a new patient and, at least every three months, conducting "Supervisory Nursing Visits" at which an HDA nurse evaluates and trains the home attendant. See Contract Arts. 1.28, 5.4; 18 N.Y.C.R.R. § 505.14(f)(3). HDA must forward to HRA copies of the performance evaluations that the nursing supervisors conduct. Contract Art. 5.4(D). HDA also evaluates home attendants' performance annually. See Gruenwald Dep. 85:9–13, 5/3/10; Contract Art. 6.2(G). The HDA personnel specialist assigned to the home attendant handles any disciplinary issues involving the home attendant. City Defendants' Local Rule 56.1 Stmt. of Facts ("Defs.' 56.1") ¶ 73.

The Contract obligates HDA to maintain a "personnel file" for each home attendant. Contract Art. 6.3(A); see Gruenwald Dep. 79:13–25, 5/3/10; Ng. Dep. 223:13–14, 4/16/10. HDA keeps the home attendant's performance evaluations, training certificates, time sheets, and

records of any disciplinary action in the personnel file.  See Gruenwald Dep. 83:25–84:18, 5/3/10; Contract Art. 6.2; see also 18 N.Y.C.R.R. § 505.14(f)(2).

HDA handles home attendants' complaints.  See Contract Art. 6.5(G)(2) (requiring HDA to have grievance procedures for home attendants' complaints regarding "conditions of employment and proposed termination of employment"); Gruenwald Dep. 85:14–86:14, 5/3/10. Unlike HDA, HRA does not accept complaints from home attendants; if a home attendant complains to HRA, HRA refers the home attendant back to HDA.  See Ng Dep. 49:3–11, 4/9/10. HDA conveys a home attendant's complaint to CASA only if the home attendant complains that the patient is asking her to perform services outside the Medicaid authorization.  See Kalvin Dep. 47:20–48:12, 11/8/10.  If this happens, CASA schedules a "case conference" with the patient and HDA, and "sometimes" with the home attendant as well, to explain to the patient the scope of the home attendant's job.  Id. 48:13–20.

In contrast, both HDA and City Defendants handle patients' complaints.  The Contract requires HDA to develop and use procedures to (1) investigate and resolve patient complaints and (2) contact patients – by telephone, home visits, or mail surveys – to obtain their responses regarding whether the home attendants' services are satisfactory.  Contract Arts. 5.4(C)(1), 6.5(G).  HDA must keep and forward to HRA records of these contacts.  Id. Art. 5.4(D).  Apart from this, HRA has a "quality assurance division," which receives patients' complaints and visits patients on a random basis to ensure that patients are receiving services and "happy with the services."  Ng Dep. 142:17–143:14, 169:23–25, 4/16/10.  It is very rare for HRA to send a quality control monitor to visit a patient.  Moss Dep. 33:9–14, 8/17/10.

When HRA receives a patient complaint, it refers the complaint to HDA to investigate and report back to HRA any actions HDA has taken.  Id. 33:24–34:10.  If the complaint alleges

that the home attendant poses a high risk to the patient, HRA will also investigate.  Id. 34:6–10.
If HRA were to determine that the home attendant posed a risk to the patient, HRA would direct
HDA to remove the home attendant from the patient's case.  Id. 34:6–10; Ng Dep. 23:5–24:22,
5/21/10.  If HDA were to refuse to remove the home attendant, HRA would pull the case from
HDA and hold HDA responsible, such as by deeming HDA "non–responsive," decreasing its
case load, or terminating the Contract entirely.  Ng Dep. 25:13–26:20, 5/21/10.  HRA has never
recommended to HDA that a specific home attendant be disciplined or deemed HDA "non-
responsive."  Id. 26:15-20; Gruenwald Dep. 364:16–18, 6/7/10.

The Contract also requires HDA to employ certain administrative staff "to operate the
program in accordance with the allowable rates and procedures promulgated by" HRA.  Contract
Art. 6.4(D).  These include a Program Director, Assistant Director for Field Operations, and
Assistant Director for Administrative Services, who are responsible to ensure that HDA complies
with the Contract and spends government funds properly.  See id. Art. 6.4(C).  HRA dictates the
minimum criteria for persons who fill these positions and reviews applicants' resumes to ensure
that the applicants are adequately qualified, but HDA selects the individuals who fill the
positions.  See id. Art. 6.4.

ii.    *Monitoring HDA*

The Regulations require HRA to "have a plan," which is subject to State approval, "to
monitor and audit the delivery of personal care services provided pursuant to" the Contract,
maintain a record of its monitoring activities, and report its monitoring activities in the annual
plan it submits to the State.  18 N.Y.C.R.R. §§ 505.14(c)(9), (12).  This monitoring includes
evaluating HDA's ability to deliver PCS, measuring HDA's performance against regulatory and
contractual requirements, and reviewing HDA's fiscal practices.  Id. § 505.14(c)(9)–(10).

9

HRA reserves the right to (1) contact patients directly to assess the sufficiency, efficiency, and adequacy of the PCS they are receiving; (2) base the assignment of cases, caseload levels, and administrative reimbursement on HDA's performance; (3) visit HDA unannounced to assess HDA's performance and, while there, provide technical assistance in solving problems affecting provision of services; and (4) review and duplicate HDA's records, which are subject to audit.  Contract Art. 9.1(B), (D), (G).

HRA, via an accounting firm, conducts an annual fiscal audit of HDA to ensure that HDA spends money appropriately, assess HDA's total expenditures and revenues, and recoup any excess funds.  Ng Dep. 17-21, 142:4–9, 4/16/10; Ng Dep. 73:9–16, 5/21/10; Tyler Dep. 49:6–11, 9/15/10.

HRA also audits HDA three times per year to ensure that HDA complies with regulatory requirements and delivers quality service.  Ng Dep. 60:7–13, 4/9/10; Ng Dep. 186:13–20, 4/16/10.  During the audits, HRA rotates through a set of approximately 30 indicators of compliance, including whether HDA nurses have visited the patient to perform the required nursing visits; whether home attendants have received certificates of training, annual medical exams, and drug screening; and whether new hires have submitted the necessary documentation. Ng Dep. 60:7–20, 4/9/10; Ng Dep. 188:11–191:10, 4/16/10.  On a random basis, HRA samples HDA's personnel files to ensure that HDA is complying with the requirement to evaluate the home attendants.  Ng Dep. 223:21–24, 4/16/10.

Additionally, the Regulations require HRA to have, and to submit to the State for approval, a plan to monitor home attendants' assignments to "assure" that home attendants "are in compliance with the training requirements."  18 N.Y.C.R.R. § 505.14(e)(8).  HRA conducts

such monitoring by reviewing a random sample of home attendants' personnel files.  Ng Dep. 180:7–17, 4/16/10.

Pursuant to the Contract, HDA must maintain "all fiscal and program statistical records" required by HRA, produce such records and data as HRA may require, and arrange with HDA's contracted computer service company for HRA to directly access any of HDA's "fiscal or programmatic records and data related to the provision of services" under the Contract.  Contract Art. 6.5(E).  The Contract also provides that to ensure compliance with the Contract, HRA may require HDA to submit "standards and procedures," including copies of HDA's organizational papers and policies for management, accounting, purchasing, and personnel.  Id. Art. 6.5(F).

### 6.   Government Reimbursement of HDA

The rate at which the government reimburses HDA includes three components:  "direct" wages and benefits for home attendants, "indirect" wages and fringe benefits for administrative staff and allocated costs, and allowable expenditures.   Contract Art. 3.4(A); see also 18 N.Y.C.R.R. § 505.14(h)(5)–(6).  Although the City proposes a reimbursement rate to the State, the State sets the rate.  See 18 N.Y.C.R.R. § 505.14(h)(7); Contract Art. 3.1.  HRA may, with State approval and after consulting with HDA, reduce the reimbursement rate if it discovers that the extant rate was based on inaccurate information that HDA furnished and accurate information would have produced a lower rate.  Contract Art. 3.2.

To receive reimbursement, HDA must submit documentation of the time its employees spend providing services.  18 N.Y.C.R.R. § 505.14(h)(1).  HDA submits this information to a company called SanData, which transmits the information to the State's Medicaid Management Information System ("MMIS") every month.  See Gruenwald Dep. 350:15–351:12, 6/7/10;

Contract Arts. 3.1(A)–(B), 7.4.  HDA receives its government reimbursement through MMIS.
Contract Art. 3.1(B).

### 7.  Home Attendants' Wages

The Contract obligates HDA to comply with the City's Living Wage Law.  Renewal Agr., dated Jan. 23, 2004, Art. 8, Ex. 3 Subexhibit 17; N.Y.C. Code § 6–109.  Pursuant to the Regulations, HDA must also pay home attendants "FICA, workers' compensation, unemployment insurance, and other employee benefits included in the providers' labor contracts."  18 N.Y.C.R.R. § 505.14(h)(3)(ii)(2)(b).

HDA's employees were not unionized.  See Tyler Dep. 15:24–16:14, 9/15/10; Gruenwald Dep. 354:13–355:4, 6/7/10.  Nevertheless, the Contract requires HDA to pay home attendants wages and benefits "comparable to that offered by not-for-profit home care agencies' collective bargaining agreements."  Contract Art. 6.3(B)(2), (C)(2).  The Contract elaborates that such wages and benefits shall include, at minimum, "base wage and differential for longevity, mutual cases, weekends, single client sleep-in, and mutual case sleep-in," and health and retirement benefits that do not require employee contributions.  Contract Arts. 6.3(B)(2), (C)(2).  Defendant Gruenwald testified that HDA "follows along the same pattern" of union rates despite not being unionized.  Gruenwald Dep. 133:15–16, 5/3/10; Gruenwald Dep. 149:3–5, 5/4/10; Gruenwald Dep. 354:25–355:4, 6/7/10; see also Tyler Dep. 16:1–14, 9/15/10.

HDA issued plaintiffs' checks.  Third Am. Compl. ¶ 31.  Plaintiff Godlewska testified that HDA paid her a flat rate per five days rather than an hourly rate.  See Godlewska Dep. 20:1–6, 1/22/09.

### 8.  Turnover

During the relevant period, plaintiff Pryzgoda spent several years, and plaintiff Hatala

spent several months-long stretches, working full-time with HDA patients.  <u>See</u> Pryzgoda Dep. 58:3–9, 62:14–22, 71:9–72:12, 2/1/10; Hatala Dep. 128:15–17, 136:7–23, 170:1–15, 2/16/10.

Defendant Gruenwald testified that HDA does not have a "high turnover rate" of home attendants, home attendants stay at HDA for "a fair amount of time," and a "small percentage" of HDA's home attendants also work for other home healthcare agencies.  Gruenwald Dep. 364:23–365:10, 371:18–23, 6/7/10.  Home attendants who do not have enough work through HDA may seek other jobs, whether at another home healthcare agency or elsewhere.  <u>See id.</u> 371:4–6; Pryzgoda Dep. 38:4–8, 2/1/10; Hatala Dep. 220:22–24, 3/9/10.

If a home attendant wishes to follow a patient from HDA to another home healthcare agency, the home attendant must apply to the new agency.  Gruenwald Dep. 365:16–366:6, 6/7/10.  The record indicates that on some occasions, some plaintiffs followed patients to or from HDA.  <u>See</u> Pryzgoda Dep. 10:2–13, 2/1/10; Hatala Dep. 71:5–23, 73:11–13, 1/21/10.

Sometimes HRA transfers patients from one home healthcare agency to another.  <u>See</u> Contract Art. 5.3(A)(3).  When this occurs, the Contract requires HDA, if the patient requests, to "make its best effort to employ and maintain current home attendants and assign such Home Attendants to such requesting [patient]."  <u>Id.</u>

## DISCUSSION

Summary judgment is "proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  <u>Doninger v. Niehoff</u>, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  The moving party is entitled to judgment as a matter of law if "the nonmoving party . . . fail[s] to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof."  <u>Id.</u>  The substantive law of the action

determines which facts are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir.2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   In other words, summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."   Donnelly v. Greenburgh Cent. School Dist. No. 7,  691 F.3d 134, 141 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).   In deciding a summary judgment motion, a court cannot credit a party's "merely speculative or conclusory assertions."   DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012);  see also Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) ("[C]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion.") (quoting Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002)).   One of the primary purposes of the summary judgment rule is "to isolate and dispose of factually unsupported claims."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The FLSA's overtime provision states, in pertinent part, that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."   29 U.S.C. § 207(a)(1). Federal regulations and the Second Circuit recognize the possibility of joint employment for purposes of determining FLSA responsibilities.   See 29 C.F.R. § 791.2(a); Zheng v. Liberty Apparel Co., 355 F.3d 61, 66 (2d Cir. 2003).   "[A]ll joint employers are responsible, both individually and jointly, for compliance with all the applicable provisions of the act, including

the overtime provisions, with respect to the entire employment for the particular workweek."  29 C.F.R. § 791.2(a).

The FLSA defines employment broadly:   "Employee" generally references "any individual employed by an employer." 29 U.S.C. § 203(e)(1).   "Employ" includes "to suffer or permit to work."  Id. § 203(g); see Barfield v. N.Y. City Health and Hosps. Corp., 537 F.3d 132, 140 (2d Cir. 2008).   Accordingly, employment for FLSA purposes is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."  Id. at 141–42.  The Court's task is to determine the "economic reality" of the employment arrangement. Zheng, 355 F.3d at 66.  In Carter v. Dutchess Community College, the Second Circuit adopted a test for joint employment which examines whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.  735 F.2d 8, 12 (2d Cir. 1984).  Subsequently, the Second Circuit held that satisfying Carter's test for "formal control" over workers is sufficient but not necessary to establish joint employment because an entity that lacks formal control may nevertheless exercise "functional control," as reflected by six non-exclusive factors:  (1) whether the purported joint employer's premises and equipment were used for plaintiffs' work; (2) whether plaintiffs belonged to an organization that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to the purported joint employer's process of production; (4) whether responsibility under the contracts could pass from one vendor to another without material changes; (5) the degree to which the purported joint employer supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the purported joint employer.  Zheng, 535 F.3d at 72.  The

Court is "also free to consider any other factors it deems relevant to its assessment of the economic realities." Id. at 71–72.

**A.  Formal Control**

**1.  Whether City Defendants Had the Power to Hire and Fire the Employees**

The first Carter factor is whether City Defendants had the power to hire and fire plaintiffs. Carter, 735 F.2d at 12.

*i.        Power to Hire*

Contrary to plaintiffs' allegation, the Regulations, and not City Defendants, set the minimum qualifications for home attendants. See 18 N.Y.C.R.R. 505.14(d)(4)–(e).  HDA, and not City Defendants, recruits and screens home attendants and chooses which ones to hire. Contract Art. 6.1(C)–(D); Gruenwald Dep. 362:22–363:3, 6/7/10.  HDA personnel specialists, and not City Defendants, decide which home attendants will receive assignments.  See Godlewska Dep. 20:19–21, 1/22/09; Bielawska Dep. 14:5–21, 1/23/09; Pryzgoda Dep. 11:3–13, 2/1/10; Pilch Dep. 13:12–18, 2/9/10; Third Am. Compl. ¶¶ 126–142 (alleging that HDA personnel specialists demanded that plaintiffs pay them kickbacks in exchange for assignments).

The Contract does require HDA to hire at least one Public Assistance recipient for each $250,000 of the Contract's value unless HDA obtains an exemption due to "extreme hardship." Contract Part II Art. 7.  However, the Contract is a model contract whose terms the State dictates.  See 18 N.Y.C.R.R. 505.14(c)(2).  And HDA alone has the power to decide which Public Assistance recipients to hire.

The Contract also requires HDA to employ certain administrative staff.  See Contract Art. 6.4.  But these positions are not home attendant positions; rather, they exist to ensure that HDA is complying with the Contract and Regulations and is accountable to the government.  See id.

Moreover, although HRA dictates the minimum criteria for persons who fill these positions and reviews applicants' resumes to ensure the applicants are qualified, HDA alone decides which qualified applicants to hire.  See id.

     *ii.*    *Power to Fire*

HDA personnel specialists handle any disciplinary issues involving the home attendants. Defs.' 56.1 ¶ 73.  HRA has never recommended to HDA that a specific home attendant be disciplined.  Gruenwald Dep. 364:16–18, 6/7/10; Ng Dep. 26:15–20, 5/21/10; see Jean-Louis v. Metro. Cable Communications, Inc., 838 F. Supp. 2d 111, 118 (S.D.N.Y. 2011) (finding that defendant cable company did not have power to fire plaintiff technicians, where "the record does not contain any evidence that Time Warner has ever instructed [vendor] to discipline . . . any individual technician").

The only patient complaints HRA investigates are those which allege that the home attendant poses a high risk to the patient.  See Moss Dep. 33:24–34:10, 8/17/10.  If HRA were to determine that the home attendant posed such a risk, HRA would direct HDA to remove the home attendant from the particular patient's case.  Id. 34:6–10; Ng Dep. 23:5–24:22, 5/21/10. There is no evidence, however, that HRA has power, let alone ever exercised power, to require HDA to fire a home attendant entirely.  See Jean-Louis, 838 F. Supp. 2d 111 at 118 (finding that demand for vendor to remove technician from only certain cases is not firing).

Accordingly, I find that City Defendants do not have power to hire and fire employees, and the first Carter factor is not satisfied.

2. **Whether City Defendants Supervised and Controlled Employee Work Schedules or Conditions of Employment**

The second <u>Carter</u> factor is whether City Defendants supervised and controlled employee work schedules or conditions of employment.  <u>Carter</u>, 735 F.2d at 12.

     *i.   Employee Work Schedules*

Simply determining when a certain job will be performed is not tantamount to determining which employee will perform that job at a particular time.  <u>See Moreau v. Air France</u>, 356 F.3d 942, 950 n.5 (9th Cir. 2004) (affirming summary judgment for airline held not to be ground handlers' joint employer, where although airline scheduled its flight into and out of the airport, "which necessarily indicated when the services were to be performed," vendors, rather than airline, were "responsible for designating which employees would report to service the aircraft"); <u>Garcia v. Pace Suburban Bus Serv.</u>, 955 F. Supp. 75, 76 (N.D. Ill. 1996) (granting defendant municipal corporation's motion for summary judgment against plaintiff bus drivers, where contract specified bus routes and schedules but did not dictate "who should drive them or how many hours they should work"); <u>Jean-Louis</u>, 838 F. Supp. 2d at 126 (rejecting plaintiff technicians' argument that defendant cable company determined their work schedules by dictating "time windows" for installation jobs, where vendor, rather than defendant, "decides which technicians will work on which job and whether a technician will work on any jobs in that period at all").

HRA determines whether a prospective patient needs any of the specific services the Regulations list and, if so, how many hours of such services the patient needs.  <u>See</u> 18 N.Y.C.R.R. § 505.14(b)(5); Kalvin Dep. 7:16–8:5, 11/8/10.  But HDA determines which home attendant to assign to the patient, given the patient's location, language, culture, and needs.  <u>See</u> Gruenwald Dep. 232:20–233:7, 5/4/10.   And HDA is responsible to find an appropriate

substitute if a home attendant is sick.  See 18 N.Y.C.R.R. § 505.14(f)(2); Gruenwald Dep. 206:17–22, 5/4/10; Hatala Dep. 264:5–10, 1/21/10; Biewlawska Dep. 10:22–24, 1/23/09; Pryzgoda Dep. 71:19–25, 2/1/10; Pilch Dep. 26:13–15, 2/9/10; Contract Art. 6.2(F).

Therefore, I find that the City does not supervise and control employees' work schedules.

ii.  *Conditions of Employment*

Exercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions.  See Zheng, 355 F.3d at 75 ("[S]upervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement.") (citing Moreau, 343 F.3d at 1188); Chen v. Street Beat Sportswear, Inc., 364 F. Supp. 2d 269, 286 (E.D.N.Y. 2005) ("[T]he Court will not consider evidence plaintiffs present with respect to this factor to the extent it concerns the presence of . . . quality control personnel."); Lepkowski v. Telatron Marketing Group, Inc., 766 F. Supp. 2d 572, 579 (W.D. Pa. 2011) ("Courts have widely held that detailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship.") (internal quotation marks omitted).

This is especially true where the quality control's purpose is to ensure compliance with the law or protect clients' safety.  See Moreau, 356 F.3d at 951 ("[M]uch of the indirect supervision or control exercised by [airline] over the ground handling employees was purportedly to ensure compliance with various safety and security regulations."); Lawrence v. Adderley Indus., No. CV–09–2309, 2011 WL 666304, at *9–10 (E.D.N.Y. Feb. 11, 2011) (granting summary judgment to defendant cable company and finding that defendant did not employ plaintiff technicians, where quality control stemmed from the nature of the cable

19

company's business and was designed partly to protect customers whose homes technicians entered) (citing <u>Jacobson v. Comcast Corp.</u>, 740 F. Supp. 2d 683, 691 (D.Md. 2010)); <u>Taylor v. Waddell & Reed Inc.</u>, No. 09 CV 2909, 2010 WL 3212136, at *3 (S.D. Cal. Aug. 12, 2010) ("[C]ompliance with legal requirements is not indicative of control for purposes of establishing an employer-employee relationship."); <u>Zhao v. Bebe Stores, Inc.</u>, 247 F. Supp. 2d 1154, 1160–61 (C.D. Cal. 2003) (denying summary judgment to plaintiffs, finding that clothing store which used compliance monitor, as Department of Labor encouraged, to ensure that garment manufacturer complied with labor laws was not joint employer); <u>Matson v. 7455, Inc.</u>, No. CV 98–788, 2000 WL 1132110, at *2 (D. Or. Jan. 14, 2000) (granting summary judgment to defendant nightclub owners who imposed "house rule" to ensure compliance with statute).

In contrast, control over the employee's "day-to-day conditions of employment" is relevant to the joint employment inquiry. <u>Lepkowski</u>, 766 F. Supp. 2d at 580; <u>see also</u> <u>Jean-Louis</u>, 838 F. Supp. 2d at 127 (granting summary judgment to defendant, contrasting efforts to ensure quality service with controlling the "day-to-day manner" in which employees provide the service); <u>Jacobson</u>, 740 F. Supp. 2d at 691(contrasting "maintain[ing] specific standards to which the [contractors] and technicians must adhere, and regularly monitor[ing] the technicians to ensure that their performance satisfies . . . expectations" with being "responsible for the day-to-day management of the technicians"). In other words, the nature of the alleged control is highly relevant. Quality control and compliance-monitoring that stem from the "nature of the[] business" – that is, from the nature of the goods or services being delivered – are "qualitatively different" from control that stems from the nature of the relationship between the employees and the putative employer. <u>Jacobson</u>, 740 F. Supp. 2d at 691–92. "[D]ifferences in the purpose and focus of the control produce[] . . . divergent conclusions." <u>Id.</u> at 691.

Applying these guidelines, I find that City Defendants do not control or supervise plaintiffs' working conditions.  City Defendants do not manage plaintiffs on a day-to-day basis.  HDA, and not City Defendants, conducts the "administrative" and "nursing" supervision of the home attendants that the Regulations require.  See 18 N.Y.C.R.R. § 505.14(f); Contract Arts. 1.28, 5.4.  As part of such supervision, HDA, and not City Defendants, trains home attendants and evaluates their job performance.  See 18 N.Y.C.R.R. §§ 505.14(d)(4), (e), (f)(2)–(3); Gruenwald Dep. 85:9–13, 5/3/10.  HDA personnel specialists, and not City Defendants, handle disciplinary issues involving the home attendants.  Defs.' 56.1 ¶ 73.  Furthermore, HDA, and not City Defendants, accepts home attendants' complaints concerning their working conditions and involves City Defendants only if somebody must explain to the patient the scope of the Medicaid authorization.  See Gruenwald Dep. 85:14–25, 86:1–14, 5/3/10; Ng Dep. 49:3–11, 4/9/10; Kalvin Dep. 47:20–48:20, 11/8/10.

In contrast, City Defendants monitor HDA's compliance with the law and ensure that HDA delivers quality service to patients.  Specifically, City Defendants determine whether prospective patients are legally entitled to Medicaid services and audit HDA to ensure that HDA adheres to regulatory requirements and uses government funding properly.  City Defendants further ensure quality service and patient safety by occasionally contacting or visiting patients in their homes and investigating those patient complaints which allege that a home attendant poses a high risk to the patient.  See Jean-Louis, 838 F. Supp. 2d at 127 (distinguishing efforts to ensure quality service from controlling the day-to-day manner in which employees provide the service); Chen, 364 F.Supp.2d at 286; Moreau, 356 F.3d at 951 ("[M]uch of the indirect supervision or control exercised by [airline] over the ground handling employees was purportedly to ensure compliance with various safety and security regulations.").  These limited

21

actions of City Defendants stem entirely from the "nature of the[] business" of providing heavily regulated, government-funded health services to patients in their homes.  Jacobson, 740 F. Supp. 2d at 691; see also Lawrence, 2011 WL 666304, at *9 (citing Jacobson, 740 F. Supp. 2d at 691).

Accordingly, I find that City Defendants do not control or supervise plaintiffs' working conditions, and the second Carter factor is not satisfied.

### 3.   Whether City Defendants Determined the Rate and Method of Payment

The third Carter factor is whether City Defendants determined the rate and method of plaintiffs' payment.  Carter, 735 F.2d at 12.  Two issues are potentially relevant to this analysis. First, plaintiffs argue that although HDA's employees were not unionized, the Contract requires HDA to pay all home attendants wages and benefits "comparable to that offered by not-for-profit home care agencies' collective bargaining agreements."   Contract Art. 6.3(B)(2)–(C)(2). (Contrary to City Defendants' claim, the Regulations contain no such requirement.)  If this requirement were attributable to City Defendants, it would be accurate to say that City Defendants determined the rate and method of plaintiffs' payment.  However, the Regulations require HRA to use a State-approved model contract, which City Defendants may vary only if the variation will not change the model contract's requirements and the State approves the variation.  18 N.Y.C.R.R. § 505.14(c).  Modifying the model contract to exempt HDA from paying union wages and benefits would have changed the model contract's requirements. Moreover, the record contains no evidence that the State would have authorized such a change. Accordingly, I cannot attribute to City Defendants the contractual provision requiring HDA to pay union wages and benefits.

Second, although the State ultimately set the hourly rate at which the government would reimburse HDA, the City may have proposed that rate to the State.  See id. § 505.14(h)(7)

(requiring the City to propose a rate to the State).  If so, and if HDA paid plaintiffs an hourly rate, the City might be said to have "effectively set a cap" on the rate at which HDA paid plaintiffs, especially because HDA is a not-for-profit agency and, therefore, would not have deducted its own profit before paying plaintiffs.  Barfield, 537 F.3d at 144–45.  The record, however, contains no evidence concerning whether the State adopted the reimbursement rate that the City proposed.  Moreover, the record is unclear as to whether HDA paid plaintiffs by the hour, as plaintiff Godlewska testified that HDA paid her a flat rate per five days rather than an hourly rate.  See Godlewska Dep. 20:1–6, 1/22/09.

Accordingly, the analysis under the third Carter factor is inconclusive.

### 4.  Whether City Defendants Maintained Employment Records

The fourth Carter factor is whether City Defendants maintained employment records. Carter, 735 F.2d at 12.  The employment records "most relevant" to FLSA payment obligations are those concerning "hours worked."  Barfield, 537 F.3d at 144.  The Contract obligates HDA to maintain home attendants' time sheets and a "personnel file" for each home attendant.  See Contract Arts. 6.3(A), 6.5(B)(2); see also 18 N.Y.C.R.R. § 505.14(f)(2); Gruenwald Dep. 79:13–25, 5/3/10; Ng. Dep. 223:13–14, 4/16/10.  HDA keeps the home attendant's performance evaluations, training certificates, time sheets, and records of any disciplinary action in the personnel file.  See Gruenwald Dep. 80:1–14, 83:25–84:18, 5/3/10; Ng. Dep. 223:13–14, 4/16/10; Contract Art. 6.2(C), (G).  The Contract does require HDA to forward to HRA copies of the performance evaluations that the nursing supervisors conduct.  See Contract Art. 5.4(D). And HRA does reserve the right to review and duplicate HDA's records.  See id. Arts. 5.4(D), 9.1.  Nevertheless, maintaining employment records is primarily HDA's responsibility, and HRA's review of certain records is "only an extension" of City Defendants' quality control

procedures.  <u>Jacobson</u>, 740 F. Supp. 2d at 692.  Accordingly, I find that the fourth <u>Carter</u> factor is not satisfied.

Furthermore, I find that on balance, the <u>Carter</u> test is not satisfied because the City did not have the power to hire and fire, did not supervise and control plaintiffs' schedules and conditions of employment, and did not maintain employment records.  In light of my finding that the first, second, and fourth <u>Carter</u> factors are not satisfied, the record's inconclusiveness as to the third <u>Carter</u> factor is immaterial.

**B.  <u>Functional Control</u>**

Having determined that City Defendants did not exercise formal control over plaintiffs, I will proceed to examine whether City Defendants nevertheless exercised functional control over plaintiffs.  <u>See</u> <u>Zheng</u>, 535 F.3d at 72 (listing non-exclusive factors to determine functional control).

**1.  Whether City Defendants' Premises and Equipment Were Used for the Plaintiffs' Work**

The first <u>Zheng</u> factor is whether City Defendants' premises and equipment were used for the plaintiffs' work.  <u>Zheng</u>, 355 F.3d at 72.  This factor "is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work."  <u>Id.</u>  The plaintiffs in this case worked in their patients' homes and did not use City Defendants' equipment.

Accordingly, the first <u>Zheng</u> factor is not satisfied.

**2.  Whether HDA Could or Did Shift as a Unit from One Putative Joint Employer to Another**

The second <u>Zheng</u> factor is whether HDA could or did shift as a unit from one putative joint employer to another.  <u>Id.</u>  This factor "is relevant because a subcontractor that seeks

business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." Id. Nevertheless, the Second Circuit has cautioned that "the absence of a broad client base" is not "anything close to a perfect proxy for joint employment." Id. Even if I determine that HDA does not shift as a unit from one putative joint employer to another, I must still examine whether HDA *could* shift if it so desired. See Jean-Louis, 838 F. Supp. 2d at 132.

It is undisputed that HDA contracts only with City Defendants. It is disputed, however, whether HDA is free to contract with providers other than City Defendants. The Contract states that "[HDA] represents that it is a Not-For-Profit Corporation organized . . . for the sole purpose of providing personal care services under contract with the City . . . to persons determined by the City . . . to be eligible for such services." Contract at 1. City Defendants argue that HDA is free to contract with non-City providers. Plaintiffs, however, argue that HDA cannot contract with other non-City providers because (1) HDA would lose its tax-exempt status if it engaged in for-profit business; (2) HDA's "only reason for existence" is to provide home attendant services under City Defendants' PCS contracts; and (3) City Defendants are the only "source of Medicaid recipients" because City Defendants administer the funding for all Medicaid patients in the City. Pls.' Repl. Mem. of Law at 7, ECF No. 279. Notably, plaintiffs do not argue that the Contract *prohibits* HDA from contracting with other providers.

Contrary to plaintiffs' argument, HDA's not-for-profit status alone does not preclude HDA from contracting with providers besides City Defendants. Likewise, the mere fact that City Defendants are "the only source of Medicaid recipients" does not preclude HDA from contracting to serve patients other than Medicaid patients. Id. However, the contractual language does suggest that the Contract *requires* HDA to be a not-for-profit corporation

25

"organized . . . for the sole purpose of providing personal care services under contract with the City."  Contract at 1.  At the very least, the Contract would need to be amended if HDA contracted to do something besides providing PCS to Medicaid recipients.

Accordingly, I find that HDA could not shift as a unit from City Defendants to another employer, and the second Zheng factor is satisfied.

### 3. The Extent to Which Plaintiffs Performed a Discrete Line-Job that was Integral to City Defendants' Process of Production

The third Zheng factor is the extent to which plaintiffs performed a discrete line-job that was integral to City Defendants' process of production.  Zheng, 355 F.3d at 72.  "Interpreted broadly, this factor could be said to be implicated in *every* subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service."  Id. at 73 (emphasis in original).  The Second Circuit, however, does not interpret this factor "quite so broadly."  Id.  Rather, the Circuit recognizes a spectrum spanning from, at one end, "piecework on a producer's premises that requires minimal training or equipment, and which constitutes an essential step in the producer's integrated manufacturing process" to, at the other end, "work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology."  Id. Moreover, courts have "question[ed] whether . . . this factor translates well outside of the production line employment situation."  Moreau, 356 F.3d at 952; see also Jean-Louis, 838 F. Supp. 2d at 134 ("[T]he third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product.").

In this case, plaintiffs did not perform piecework or a discrete line-job.  Plaintiffs' work required a fair amount of training – forty hours of "basic" training, six annual hours of "in-

service" training, and on-the-job training as needed.   18 N.Y.C.R.R. § 505.14(d)(4)–(e).
Furthermore, I "doubt" that providing home healthcare service is actually integral to City
Defendants.  Moreau, 356 F.3d at 952 ("[W]e . . . doubt that functions . . . such as food service or
cargo transport, are actually 'integral' to a passenger airline.").

Accordingly, I find that the third Zheng factor is not satisfied.

### 4.   Whether Responsibility Under the Contracts Could Pass from One Home Healthcare Agency to Another Without Material Changes

The fourth Zheng factor is whether responsibility under the contracts "could" pass from
one home healthcare agency to another without material changes.  Zheng, 355 F.3d at 72.  The
factor "asks not whether all of the putative joint employer's contractors do the same work but
whether, if the putative joint employer hired one contractor rather than another, 'the *same*
employees'" could "'continue to do the *same* work in the *same* place.'"  Jean-Louis, 838 F.
Supp. 2d at 135 (quoting Zheng, 355 F.3d at 74) (emphasis in original).  For example, in Chen,
plaintiff garment workers argued that defendant clothing manufacturer was their joint employer
because they performed transient work for several contractors, who all contracted with
defendant.  364 F. Supp. 2d at 285–86.  The court found that the fourth Zheng factor weighed in
favor of a finding of joint employment because "plaintiffs were tied to [defendant] rather than to
the contractors that hired them."  Id. at 286 (citations omitted).

If HRA were to terminate its contract with HDA, City Defendants would reassign HDA's
patients to another home healthcare agency (or several other home healthcare agencies).  If a
patient's home attendant wished to follow the patient from HDA to the newly assigned agency,
the home attendant would need to apply to the new agency.  See Gruenwald Dep. 365:16–366:6,
6/7/10.  The new agency would have hiring discretion but would presumably be obligated to

27

"make its best effort" to hire the incoming patient's home attendant from HDA if the patient so requested.  Contract Art. 5.3(A).  The record reflects that on some occasions, some plaintiffs followed patients to or from HDA.  See Pryzgoda Dep. 10:2–13, 2/1/10; Hatala Dep. 71:5–23, 73:11–13, 1/21/10.  Therefore, it is possible, though I cannot say whether it is likely, that the new agency (or agencies) would hire the HDA home attendants to continue providing the same PCS for the same patients.

Accordingly, I find that the fourth Zheng factor is satisfied, albeit not as overwhelmingly as if the evidence showed a likelihood, rather than a mere possibility, that if HRA terminated HDA's contract, plaintiffs would continue doing the same work in the same place.

### 5.   The Degree to Which City Defendants Supervised Plaintiffs' Work

The fifth Zheng factor is the degree to which City Defendants supervised plaintiffs' work. Zheng, 355 F.3d at 72.  The inquiry under this factor is "largely the same" as the inquiry under the second Carter factor and is the most relevant factor in determining whether a purported joint employer exercises functional control over plaintiffs.  Jean-Louis, 838 F. Supp. 2d at 126 n.7.

As discussed in analyzing the second Carter factor, City Defendants did not supervise plaintiffs' work, manage plaintiffs on a day-to-day basis, or evaluate plaintiffs' performance. City Defendants merely exercised quality control to ensure that HDA delivered quality service and complied with legal requirements.  See, e.g., Zheng, 355 F.3d at 75; Chen, 364 F. Supp. 2d at 286; Moreau, 356 F.3d at 951.  These limited measures stemmed from the "nature of the[] business" of providing heavily regulated, government-funded health services to patients in their homes – not from the nature of any employment relationship between City Defendants and plaintiffs.  Jacobson, 740 F. Supp. 2d at 691; see Lawrence, 2011 WL 666304, at *9.

Accordingly, I find that the fifth Zheng factor is not satisfied.

**6.   Whether Plaintiffs Worked Exclusively or Predominantly for City Defendants**

The sixth Zheng factor is whether plaintiffs worked exclusively or predominantly for City Defendants.  Zheng, 355 F.3d at 72.

During the relevant period, plaintiff Pryzgoda spent several years, and plaintiff Hatala spent several months-long stretches, working full-time with HDA patients.  See Pryzgoda Dep. 58:3–9, 62:14–22, 71:9–72:12, 2/1/10; Hatala Dep. 128:15–17, 136:7–23, 170:1–15, 2/16/10. Accordingly, I find that plaintiffs worked exclusively or predominantly for City Defendants, "albeit by [their] own choice," and the sixth Zheng factor is satisfied.  Lawrence, 2011 WL 666304, at *10.

Nevertheless, I find that, on balance, City Defendants did not exercise functional control over plaintiffs.  See Zheng, 355 F.3d at 76–77 ("[T]he Court need not decide that *every* factor weighs against joint employment.") (emphasis in original).  The first and third Zheng factors are not satisfied; plaintiffs did not use City Defendants' premises and equipment for their work, nor did plaintiffs perform a discrete line-job that was integral to City Defendants' process of production.  Most importantly, the fifth Zheng factor is not satisfied; City Defendants did not supervise plaintiffs' work, manage plaintiffs on a day-to-day basis, or evaluate plaintiffs' performance.  In short, City Defendants did not relate to plaintiffs as an employer.  While the overlapping second, sixth, and, to a lesser extent, fourth Zheng factors are satisfied, the sum of their satisfaction in this case is that plaintiffs (1) worked full-time for an agency that can contract with only the City and (2) might follow their patients to other such agencies.  This alone does not reflect that City Defendants controlled plaintiffs in the context of an employment relationship.

Accordingly, I find that City Defendants are not plaintiffs' joint employer.  No genuine issue of material fact remains, and City Defendants are entitled to judgment as a matter of law.

## CONCLUSION

City Defendants' motion for summary judgment is granted, and plaintiffs' cross-motion

for summary judgment is denied.


**SO ORDERED.**

Dated: January 2, 2013
        Brooklyn, New York

_____ /s/ _____

JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

*Copies also sent to:*


David S. Greenhaus
Jackson Lewis LLP
58 South Service Road, Suite 40
Melville, NY 11747
*Attorney for defendants HDA, Human Development Association, Inc., d/b/a HDA;*
*Yechila Gruenwald a/k/a Yechiel Gruenwald individually and as Executive Director of*
*HDA; Zvi Kestenbaum; Marina Voskoboyniko; Golda Pokhis a/k/a Olga Pokhis; and*
*Margararita Zilbert*

Anne P. Edelman
Kaufman, Dolowich & Voluck & Gonzo, LLP
135 Crossways Park Drive, Suite 201
Woodbury, NY 11797
*Attorney for defendants HDA, Human Development Association, Inc., d/b/a HDA;*
*Yechila Gruenwald a/k/a Yechiel Gruenwald individually and as Executive Director of*
*HDA; Zvi Kestenbaum; Marina Voskoboyniko; Golda Pokhis a/k/a Olga Pokhis;*
*Margararita Zilbert; Jane Doe a/k/a "Mrs. Friedman"; Jane Does 1–10 and John Does*
*1–10*

Jeffrey S. Ettenger
Kaufman, Dolowich & Voluck & Gonzo, LLP
135 Crossways Park Drive
Suite 201
Woodbury, NY 11797
*Attorney for defendant HDA, Human Development Association, Inc., d/b/a HDA*

Joshua Robert Fay
New York City Law Department, Labor and Employment

100 Church Street
New York, NY 10007–2601
*Attorney for City Defendants*

Lisa Marie Griffith
New York City Law Department
Office of the Corporation Counsel
100 Church Street, Room 2–193
New York, NY 10007–2601
*Attorney for City Defendants*