**ROBERT WISNIEWSKI P.C.**
ATTORNEYS-AT-LAW

225 BROADWAY, SUITE 1020 • NEW YORK, NY 10007
TEL: (212) 267-2101 • FAX: (212) 587-8115
WEBSITE: www.rwapc.com

March 31, 2018

Via ECF
The Honorable James Orenstein, USMJ
225 Cadman Plaza East
Courtroom 11D South
Brooklyn, New York 11201

      Re: Elzbieta Godlewska, et al. v. HDA, Human Development Association, Inc., et al.
      Case No.: 03 Civ. 3985 (JO)

Your Honor:

**Introduction**

    Plaintiffs' counsel and Defendants' counsel write jointly to explain the current state of circumstances to the Court and respectfully to request that Your Honor reconsider its March 19 order as more fully set forth below. District court's power to rescind, reconsider or modify its orders is derived not from Federal Rules of Civil Procedure but also from the common law. *See* ***City of L.A. v. Santa Monica BayKeeper***, 254 F3d 882 (9th Cir. 2001)

    We believe that we have failed to fully communicate what has transpired to date and are, of course, distressed beyond measure that our laconic communications to the Court created a misunderstanding that may have caused Your Honor to keep the March 19 conference short. We had hoped to make a more thorough presentation at the conference and now write in an attempt to provide more information and to clarify any misunderstanding.

    By way of example, we felt the Court believed we did not begin working on this settlement until just before the trial date. That is not true. Attached hereto as **Exhibit 1** are some of the e-mails between counsel concerning the documenting of the settlement. These are all after a year and a half of negotiations and after we agreed upon the amount to be paid for settlement.[1] In any event, a review of the e-mails reflects that the documentation process began in November of 2017 and was interrupted by the death of the mother of counsel to the Plaintiffs. (Mrs. Wisniewski passed in Warsaw on November 29, 2017 and Plaintiffs' counsel had to spend a sustained period of time in Poland to attend to her affairs and returned to New York on January 9, 2018.) We can only assure the Court that counsel worked diligently to document a very

---

[1] This was no small feat in and of itself. Two thirds (2/3) of the settlement payment comes from the non-party purchaser of the Defendant HDA, Human Development Association, Inc.'s ("HDA's") assets, only one third (1/3) from HDA itself.

Page 1 of 7

difficult and unusual settlement in a case involving: 189 plaintiffs in which no class had been certified, an investigation by the Office of Medicaid Inspector General ("OMIG") regarding alleged Medicaid overpayments and a parallel state court proceeding to approve the sale of Defendant HDA's assets.

**The Nature Of The Proposed Settlement And Of The Settlement Procedure**

We also felt there could be some confusion concerning the logistics of the proposed settlement, which we specifically modeled on a Rule 23 class settlement procedure so as to afford due process to all Plaintiffs and other non-party creditors of HDA, to wit: OMIG and the City of New York, Human Resources Administration ("NYCHRA"). We did so because we knew from prior experiences that obtaining the signatures of all 189 Plaintiffs presented a logistical nightmare: (a) a vast majority of Plaintiffs are older immigrants with a low proficiency in English and the internet use; (b) a large number of Plaintiffs are retired and are no longer in this country, mostly in the Carribbean and in Poland; (c) a majority of Plaintiffs leave for extended periods of time to be with their families, especially around Christmas or Easter holidays (a vast majority of Plaintiffs are Catholic); (d) those Plaintiffs who are still employed either find it difficult or are reluctant to take a day off for financial reasons to visit Plaintiffs' counsel's office. Plaintiff's counsel's experience from the past communications with Plaintiffs was that on average it often took several weeks per Plaintiff of sustained efforts to communicate and remind the plaintiff both by telephone and by letter to obtain any information or a signature on discovery responses. Having considered all of these, counsel for the parties were hoping that Your Honor would conclude that a *quasi* Rule 23 settlement process would be the most efficient and least costly and burdensome way of settling this matter.

As mentioned above, the settlement discussions between the parties continued from before the settlement conference presided over by Your Honor and resulted in an agreement in principle as to the amount in or around November of 2017. During this period, Plaintiffs' counsel was assisted by the negotiating committee comprised of all remaining original plaintiffs, namely Barbara Hatala, Krystyna Bielawska, Barbara Pilch and Boleslaw Przygoda. During the two years plus that the negotiations were ongoing, which ran parallel to the discovery period, Plaintiffs' counsel periodically informed all Plaintiffs in detailed letters about the status of negotiations and all relevant facts that emerged in the meantime, the most important of which was OMIG's demand that HDA return over $40 million in alleged Medicaid overpayments[2] and what danger it posed to HDA's viability as a going concern and, thus, any collectibility of a potential judgment. Plaintiffs' counsel also informed Plaintiffs of the subsequent efforts by HDA to sell all of its assets to another company and cease doing business, which would effectively deprive Plaintiffs of any recovery unless another lawsuit was undertaken against the purchaser of HDA's assets and his efforts to block the sale. Finally, and most importantly, Plaintiffs were advised in detail about the set-aside of a $400,000 fund by the state court for the benefit of

---

[2] In fact, it was Your Honor who alerted counsel at the settlement conference to potential criminal liability for settling the case at bar without Medicaid's knowledge or approval.

Plaintiffs, OMIG and NYCHRA and that any settlement amount for Plaintiffs would be very limited. While Plaintiffs' counsel wrote detailed letters to this sizable group, very few Plaintiffs other than the original Plaintiffs were in constant contact with him, calling only if they had additional questions or issues.

Also, Plaintiffs' counsel had experience from the past efforts to have Plaintiffs come to the office to provide information or to execute documents, which required numerous and sustained efforts over several months to complete. Under the settlement, a substantial number of Plaintiffs receive small amounts of money and forty Plaintiffs stand to receive no money at all. As a result, a large number of Plaintiffs will most likely conclude that it simply does not pay for them to come to Plaintiff's counsel's office to execute settlement documents.[3]

Further, while Plaintiffs' counsel and Defendants' counsel were negotiating, HDA and its successor, HDA-NY, were negotiating with OMIG and NYCHRA about any return of allegedly overpaid Medicaid funds. Obviously, these non-parties were in competition with Plaintiffs for any limited funds that HDA might have and the $400,000 fund set aside by the state court.

For all of these reasons, as well as the potential interest that OMIG and the NYC HRA may have in the settlement amounts being paid hereunder, counsel for the parties have devised a system of approving the settlement that would take all of these problems into account. What they have proposed is a procedure routinely utilized in Rule 23 class action settlements – whereby a notice will be sent to all Plaintiffs and non-parties entitled to notice about the settlement and their three options. The Court indicated this was not a final settlement and that is not in issue. There can be no final settlement absent a determination of fundamental fairness and a "Cheeks" review. We do submit, however, that the offering of three alternatives to the potentially settling Plaintiffs (i.e., accept the settlement by doing nothing, object to the settlement, but remain a participant, or opt out of the settlement to commence a separate proceeding) is eminently fair and comports with the requirements of due process. Provided there were objectors or those who wished to opt-out, this Court would hold a hearing to hear any objections and to determine the fairness of the settlement as in any class action.

After reaching an agreement in principle with HDA and HDA-NY, Plaintiffs' counsel sent out detailed charts showing Plaintiffs how much they stood to receive under the settlement vis-a-vis their potential maximum recovery at trial as well as reiterating the pros and cons of the settlement. Following the distribution of such tables, Plaintiff's counsel and his office held teleconferences with over fifty Plaintiffs, virtually all of whom eventually approved the settlement amounts they stood to receive or expressed understanding why they were not entitled

---

[3] This is precisely what happened when Plaintiffs' counsel's office communicated with Plaintiffs following the March 19 conference. Those who receive less than $200 advised his office that it would not make sense for them to take a day off or to travel far to sign any documents.

to any settlement.[4] Based on prior communications with Plaintiffs, Plaintiff's counsel has reason to believe that virtually all Plaintiffs will accept the settlement.

For the reasons set forth above, forcing all Plaintiffs to execute the settlement documents will not only work hardship on a great number of them, it will almost guarantee that those Plaintiffs who stand not to receive very small settlement amounts or no settlement at all will not execute the document. For the same reasons, this requirement will work undue hardship on Plaintiff's counsel, as his office will have to engage in Herculean efforts to keep after a large group of Plaintiffs over a sustained period of time and, at the same time, it will force both Plaintiffs' and Defendants' counsel to prepare for a trial for all 189 Plaintiffs, as there will be no certainty as to who will manage to sign the document in the end. Both counsel submit that this costly and monumental effort that will be avoided altogether with the jointly proposed mechanics of *quasi* Rule 23 settlement.

Finally, when a number of Plaintiffs appear before the Court to try the case, HDA may walk away from the settlement. In the absence of this settlement, the purchaser – HDA-NY – will likely cancel the purchase. Each settlement is integrally related to the other settlement. It would not make sense for HDA-NY to pay to acquire a potential forty plus million dollar (>$40,000,000.00) liability with Medicaid and a substantial judgment in the case at bar and continued litigation to determine, if the sale of HDA's assets created a successor-in-interest liability.

If this matter settles, however, not only will plaintiffs at bar receive what is believed to be a fair and reasonable settlement, but also OMIG and NYCHA fall into place and over one thousand (1,000) home health care aides stand to keep their jobs and approximately 500 residents of Brooklyn will continue to receive home attendant services. Achieving this global resolution was the goal of the litigants towards which counsel for all parties worked for well over two years. Counsel for the parties respectfully submit that strict adherence to formalities in this case as ordered by Your Honor threatens to actually destroy the settlement at bar and, *eo ipso*, the interrelated settlement.

**The Legal Basis For The Proposed Settlement Procedure**

The method of settlement approval proposed by the parties not only comports with the notions of due process but also offers the most expeditious and least expensive way of approving the settlement. Counsel concede that this method merely parrots Rule 23 class settlement procedures but they firmly believe that this Court possesses inherent power to allow for this manner of settling this case as the most efficient and least expensive method under the unique circumstances of this case. Rule 1 of the Federal Rules of Civil Procedure makes plain that the Rules "should be construed, administered, and employed by the court and the parties to secure

---

[4] In certain instances, based on discussions with individual Plaintiffs modifications were made to the amounts they stood to receive.

the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The United States Supreme Court emphasized such interpretation as well. **Bankers Trust Co. v. Mallis**, 435 US 381, 98 S Ct 1117, 55 L Ed 2d 357 (1978).

In addition to the powers granted them by the federal rules of civil procedure, courts possess an inherent power to manage their affairs. As one Circuit Court explained:

> The concept that district courts exercise procedural authority outside the explicit language of the rules of civil procedure is not frequently documented, but valid nevertheless. The Supreme Court has acknowledged that the provisions of the Federal Rules of Civil Procedure are not intended to be the exclusive authority for actions to be taken by district courts. In **Link [v Wabash R. Co.**[5]**]**, the Supreme Court noted that a district court's ability to take action in a procedural context may be grounded in 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. This authority likewise forms the basis for continued development of procedural techniques designed to make the operation of the court more efficient, to preserve the integrity of the judicial process, and to control courts' dockets. Because the rules form and shape certain aspects of a court's inherent powers, yet allow the continued exercise of that power where discretion should be available, the mere absence of language in the federal rules specifically authorizing or describing a particular judicial procedure should not, and does not, give rise to a negative implication of prohibition.

**G. Heileman Brewing Co. v. Joseph Oat Corp**., 871 F.2d 648, 652 (7th Cir. 1989)(quotations and citations omitted).

Thus, "[c]ourts have the inherent power to do all things that are reasonably necessary for the administration of justice within the scope of their jurisdiction." **Colondres v. Scoppetta**, 290 F. Supp. 2d 376, 380 (E.D.N.Y. 2003). And they "may exercise its inherent power to protect the parties appearing before it, to preserve the integrity of an action, to maintain its ability to render a final judgment and to ensure the administration of justice." **Haitian Ctrs. Council, Inc. v. Sale**, 817 F. Supp. 336, 337 (E.D.N.Y. 1993); *see* also Fed. R. Civ. P. 83(b) ("*Procedure When There Is No Controlling Law*. A judge may regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§2072 and 2075, and the district's local rules.") Consequently, there is no doubt that this Court has inherent authority as well as the authority under the Rules to devise in the case at bar a *quasi* Rule 23 settlement procedure proposed by both counsel that will "secure the just, speedy, and inexpensive determination of ...[this] proceeding." Fed. R. Civ. P. 1.

---

[5]   370 U.S. 626, 82 S. Ct. 1386, 8 L.Ed.2d 734 (1962)

The proposed *quasi* Rule 23 settlement approval procedure also comports with the "Cheeks" review, whose focus is on fairness and reasonableness of settlement. The Court indicated this was not a final settlement and that is not in issue. There can be no final settlement absent a determination of fundamental fairness and a "Cheeks" review. Counsel for the parties do submit, however, that the offering of three (3) alternatives to the potentially settling Plaintiffs (i.e., accept the settlement by doing nothing, object to the settlement but remain a participant, or opt out of the settlement to commence a separate proceeding) is eminently fair. This procedure also further protects the settlement from any claims by OMIG and the NYCHRA, inasmuch as they will be afforded an opportunity to come to the Court and object to the settlement. Because this somewhat unconventional method of settlement is the most efficacious manner of settling this case and this Court is empowered to allow for this type of settlement, it is respectfully submitted that the Court approve it in the interest of justice and reducing expense to the parties.

Should this Court decline to rescind or modify its order, counsel for the parties respectfully request that they be given more time to secure signatures of all Plaintiffs, so as to forestall a trial. As previously mentioned, at present a large number of Plaintiffs are visiting their families for Easter. Most of them are older women who are either not very familiar with the internet or may not have easy access to it. They are either in the Carribean or Poland and, given the cost of airfare, they are expected to stay there for several weeks. Also, a number of them live outside the US permanently. Sending letters to their homes or leaving messages will not suffice, as they will not be able to execute any documents until they return to New York City.

Further, Plaintiff's counsel has a previously scheduled trip to Poland from April 24 to May 9. The purpose of the trip concerns resolution of additional family issues stemming from his mother's passing. Other family members will be meeting Plaintiffs' counsel at this time and already made travel arrangements as well. Plaintiffs' counsel will, however, be able to use this time to obtain signatures from Plaintiffs who are permanently or temporarily in Poland over the Easter holiday.

**<u>Conclusion</u>**

As set forth above, we believe we may have failed to accurately communicate with the Court and have written in an attempt to correct any such misunderstanding.

Finally, we felt that Your Honor thought that we were not sufficiently apologetic for the delay in (we thought) presenting the settlement documentation and backup documentation for costs. Respectfully, this could not be further from the truth. Plaintiff's counsel and his personnel worked literally for several weeks and very late hours to complete the settlement documentation as well as backup documents for costs in this 14 year case (as was evidenced by three (3) huge binders of backup documents submitted to Your Honor). Defendants' counsel maintained a constant attention to the documentation and needed to consult with third-party attorneys whose input was necessary to the drafting process. Counsel worked together in the interest of their respective clients. We do apologize that we were unable to present the settlement documentation

sooner. It was not for lack of effort.

**Relief Requested**

      We respectfully request that Your Honor revisit the proposed settlement procedure as set forth in the settlement documents and in this letter (and we stand ready to provide any additional information or explanation) or, in the alternative, that the parties be given until Monday, June 4, 2018 or to any date thereafter agreeable to Your Honor to obtain signatures on the settlement documents from all Plaintiffs or to appear for trial.

      Your consideration of the above is appreciated.

| | |
|---|---|
| Respectfully submitted, | Respectfully submitted, |
| Robert Wisniewski P.C. | Meltzer, Lippe, Goldstein & Breitstone, LLP |
| _/s/Robert Wisniewski_<br>Robert Wisniewski, Esq. | _/s/ Richard M. Howard_<br>Richard M. Howard, Esq. |